COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
PROBATE AND FAMILY COURT DEPARTMENT

MIDDLESEX, SS

PROBATE COURT
DOCKET NO. 95W-0008-PA

VICTORIA ANNE GUENTHER,
          PLAINTIFF

vs.

ANTHONY VISONE,
          DEFENDANT

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW
ON COMPLAINT FOR PATERNITY

This case was heard on August 5 and 6, November 17, 18 and 19 of 1998 and April 1, 1999.

Judith Nelson Dilday presided. After hearing the parties and examining the evidence, I make the

following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT

1. This is a paternity action. The name of the mother is Victoria Anne Guenther who

lives at 167 Hopkins Street, Reading, MA. She was born on October 26, 1974 and is 24 years

old.

2. The father is named Anthony Visone. He lives at 15 Tedford Lane, Lynnfield, MA.

He was born on February 8, 1961 and is 28 years old.

3. The minor child is Alexandria Rose Guenther who was born on February 24, 1994 and

is 5 years old. She lives at 167 Hopkins Street, Reading, MA with her mother and grandparents.

1



4. The mother and the putative father were never married.

5. The paternity of Alexandria Rose Guenther is not contested or at issue.

6. Anthony Visone is the biological father of Alexandria Rose Guenther.

## PROCEDURAL HISTORY

7. The plaintiff, Victoria Anne Guenther, filed a Complaint for Paternity on or about January 6, 1995 against the defendant, Anthony Visone. The defendant admitted to being the father of the child.

8. On January 17, 1995, Temporary Orders were entered providing for the payment of child support by the defendant, the procurement of a life insurance policy by and on the life of the defendant for the benefit of the minor child and the payment of plaintiff's attorney's fees.

9. Since filing her Complaint for Paternity, the plaintiff has filed at least 4 Complaints for Contempt against the defendant to compel compliance with Court Orders and 4 Motions to Compel due to the defendant's failure to produce discovery.

10. This matter was specially assigned to the Honorable Judith Nelson Dilday on October 3, 1997.

11. Pursuant to the Complaint in Equity, receiver was appointed to take charge of Visone Motors in December of 1998.

12. Anthony Visone claimed that the receivership has ruined his business.

## BACKGROUND

13. In February of 1993, at the age of 18, Victoria Anne Guenther was employed at one of the companies owned by Anthony Visone, then 32 years of age. During the course of her employment, Ms. Guenther and Mr. Visone entered into a personal relationship, which resulted

2

in the birth of their daughter, Alexandria Rose Guenther. (Testimony of plaintiff and defendant).

14. The defendant was divorced from his first wife in 1991, and there is one child born of that marriage, Toni Visone, now nine years old. (Testimony of the defendant).

15. Since Alexandria Guenther's birth, sole legal and physical custody have been with the plaintiff. The defendant has been entitled to supervised visitation with the child since January of 1995. (Testimony of the plaintiff).

16. The defendant has not made significant efforts to establish a parental relationship with his daughter, Alexandria Guenther. (Testimony of the plaintiff, testimony of the defendant, testimony of Michael Guenther).

17. The parties have not successfully exercised joint responsibility for the child nor do they have the ability to communicate and plan with each other regarding the child's best interests. (Testimony of the plaintiff, testimony of the defendant).

18. The plaintiff has been a full time mother and student and not otherwise gainfully employed outside the home between July of 1993 and the Spring of 1998. (Testimony of the plaintiff).

19. The plaintiff matriculated toward her undergraduate degree during her pregnancy and after the birth of the minor child. (Testimony of the plaintiff).

20. The plaintiff is employed by G&G Food Products, LLC, a company formed in 1998 by the plaintiff and her father, Michael Guenther. (Testimony of the plaintiff and Michael Guenther).

21. The plaintiff, a Spring of 1998 graduate of Bentley College, has recently tried to start this business with her father, Michael Guenther. This business has no assets and provides no

3

source of income to the plaintiff at this time. (Testimony of the plaintiff and Michael Guenther, Exhibit 36).

22. The plaintiff has no current source of income with which to provide support for the minor child. (Testimony of the plaintiff and Exhibit 36).

23. The plaintiff has the educational background and work experience required to be gainfully employed.

24. The defendant is Harvard educated and an experienced businessman. (Testimony of the defendant).

25. The defendant pays $1,825.00 per month in child support payments for the support of the child born of his prior marriage plus alimony to his former wife pursuant to an outstanding order of the Suffolk County Probate Court.

26. The defendant has misrepresented to this Court both his income and assets for the purpose of avoiding an appropriate child support order. (Testimony of the defendant).

27. The defendant has the educational background and business experience required to be gainfully employed. (Testimony of the defendant).

28. In 1993, the defendant's personal net worth was in excess of fifteen million dollars. (Testimony of John Casey and Exhibit 54B).

29. The defendant is 100% shareholder of First City Management. (Testimony of Robert Gorton, testimony of John Casey and Exhibit 4).

30. The defendant is an owner of U.S. Autobrokers, LLC, an entity doing business as Visone Corvette. (Testimony of Michael Bridgman and Joseph Graziano).

31. In 1994, the defendant's personal net worth was in excess of sixteen million dollars.

31. In 1994, the defendant's personal net worth was in excess of sixteen million dollars. (Testimony of John Casey and Exhibit 54B).

32. The defendant's company, First City Management, Inc., or one of its subsidiaries entered into an asset-back securitization from which the company made a net profit of 7.7 million dollars. (Testimony of John Casey).

33. The proceeds of that transaction were deposited int a Fleet Account over which the defendant exercised exclusive control. (Testimony of John Casey).

34. The defendant has repeatedly offered conflicting testimony while under oath. (Testimony of the defendant).

35. Timothy J. Burke is an attorney licensed to practice law in the Commonwealth of Massachusetts and a certified public accountant licensed to practice as an accountant in the Commonwealth of Massachusetts. (Testimony of Timothy Burke).

36. Timothy J. Burke was qualified to give expert testimony in this case.

37. Timothy J. Burke has examined Federal Form 1065 tax returns and financial statements for Broadway Realty Trust. (Testimony of Timothy Burke).

38. Timothy J. Burke reviewed the personal tax returns and financial statements of the defendant, Anthony Visone individually. (Testimony of Timothy Burke).

39. Timothy J. Burke reviewed the Form 1941 Federal Tax Returns for FCM1 Realty Trust. FCM2 Realty Trust, FCM3 Realty Trust. (Testimony of Timothy Burke).

40. Timothy J. Burke reviewed the corporate federal income tax returns, audited financial statements and in-house financial records for First City Management, Inc. and subsidiaries. (Testimony of Timothy Burke).

defendant, Anthony Visone, for the purpose of determining if said loans should be classified as "loans" or "constructive dividends" paid by First City Management, Inc. to Anthony Visone. (Testimony of Timothy Burke).

42. As of December 31, 1993, First City Management, Inc. has outstanding loans to shareholders, as reported on its corporate federal income tax return (Internal Revenue Service Form 1120), of $676,272.00. (Testimony of Timothy Burke).

43. In 1994-1996, First City Management, Inc's sole shareholder was Anthony Visone. (Testimony of the defendant and Exhibit 4).

44. As of December 31, 1994, First City Management, Inc. has outstanding loans to shareholders, as reported on its corporate federal income tax returns (Internal Revenue Service Form 1120), of $1,573,391.00, an increase of $897,110.00 over December 31, 1993. (Testimony of Timothy Burke).

45. As of December 31, 1995, First City Management, Inc. had outstanding loans to shareholders, as reported on its audited financial statements of $2,245,424.00. (Exhibit 4).

46. The figure $2,245,424.00 accurately reelects the dollar amount of outstanding loans First City Management, Inc. had made to shareholders as of December 31, 1995 and that the increase in calendar year 1995 was approximately $671,853.00 over the year end 1994 figure. (Exhibit 38N and 38O).

47. Information regarding loans made by First City Management, Inc. to shareholders in calendar year 1996 was inconsistent and loan amounts from First City Management, Inc. to shareholders in 1996 were at a minimum $1,030.590.00. (Testimony of Timothy Burke).

48. In 1994-1996, no ceilings existed to limit the amount of money loaned by First City

Management, Inc. to Anthony Visone. (Testimony of Timothy Burke).

49. In 1994-1996, no security was given by Anthony Visone to First City Management, Inc. for the loans made by said corporation to Anthony Visone. (Testimony of Timothy Burke).

50. In 1994-1996, there was no maturity date for the repayment of any loans made by First City Management, Inc. to Anthony Visone. (Testimony of Timothy Burke).

51. In 1994-1996, inclusive, First City Management, Inc. did not undertake any actions to force the repayment of loans made by the corporation to Anthony Visone. (Testimony of Timothy Burke).

52. In 1994-1996, Anthony Visone made no attempts to repay any portion of loans received from First City Management, Inc. (Testimony of Timothy Burke).

53. In 1994-1996, inclusive, First City Management, Inc. did not charge any interest to Anthony Visone for loans said corporation made to Anthony Visone. (Testimony of Timothy Burke).

54. In 1994-1996, Anthony Visone gave no certificate of indebtedness to First City Management, Inc. (Testimony of Timothy Burke).

55. In 1994-1996, there was no agreement between First City Management, Inc. and Anthony Visone, which established an absolute and unconditional duty on the part of Anthony Visone to repay the loans made by First City Management, Inc. to him. (Testimony of Timothy Burke).

56. The loan amount of $897,119.00 made by First City Management, Inc. to Anthony Visone in 19994 was a "constructive dividend" and should be deemed income to Anthony Visone. (Testimony of Timothy Burke).

57. The loan amount of $671,853.00 made by First City Management, Inc. to Anthony Visone in 1995 was a "constructive dividend" and should be deemed income to Anthony Visone. (Testimony of Timothy Burke).

58. The loan amount of $1,030,590.00 made by First City Management, Inc. to Anthony Visone in 1996 was a "constructive dividend" and should be deemed income to Anthony Visone. (Testimony of Timothy Burke).

59. In 1994, Anthony Visone had taxable income, as reported, of $153,898.00, and adding to that the constructive dividend of $897,169.00, had total taxable income of $1,051,017.00.  (Testimony of Timothy Burke).

60. In 1995, Anthony Visone had taxable income, as reported, of $127,174.00, and adding to that the constructive dividend of $671,853.00, had a total taxable income of $799,027.00.  (Testimony of Timothy Burke).

61. In 1996, Anthony Burke had taxable income, as reported, of $16,337.00 and adding to that the constructive dividend of $1,030,590.00, had a total taxable income of $1,046,927.00. (Testimony of Timothy Burke).

62. Though the defendant's reported earnings for 1996, in his 1996 W-2 were $24,500.00, the defendant made weekly deposits into his personal checking account of at least $3,323.47 between February 23, 1996 and March 6, 1997.  (Exhibit 31 and Exhibit 54C).

63. The defendant deposited $736,748.60 into his personal checking account with Fleet Bank in 1997 (Exhibit 54C).

64. The defendant deposited $216,196.20 into his personal checking account with Fleet Bank in 1997.  (Exhibit 54C).

8

65. The defendant's weekly deposit into his Fleet checking account was reduced from $3,323.47 to $1,823.56 on March 13, 1997 (one week before he filed his financial statement in Court indicating a gross weekly income of $500.00). (Exhibit 27 and Exhibit 54C).

66. The defendant deposited $69,188.55 into his personal checking account with fleet Bank between January 1, 1998 and September 29, 1998. (Exhibit 54C).

67. The defendant received income in the form of cash and in-kind distributions from Broadway Realty Trust. (Testimony of John Casey and Exhibit 42).

68. The in-kind distributions taken by the defendant from Broadway Realty Trust include but are not limited to payments to babysitters, child support payments to his ex-wife, payment for cable service, lawn service, electric service, propane gas service and property taxes for 15 Tedford Lane, Lynnfield, MA. (Exhibit 42).

69. The plaintiff currently has no assets available to provide support for her child. (Plaintiff's testimony).

70. In 1993, Anthony Visone's equity as the sole stockholder in First City Management, Inc., and subsidiaries was $6,661,569.00. (Plaintiff's Exhibit 12).

71. In 1994, Anthony Visone's equity as the sole stockholder in First City Management, Inc., and subsidiaries was $9,963,666.00. (Plaintiff's Exhibit 12).

72. In 1995, Anthony Visone's equity as the sole stockholder of First City Management, Inc., and subsidiaries was $9,979,617.00. (Plaintiff's Exhibit 12).

73. In 1996, Anthony Visone's equity as the sole stockholder of First City Management, Inc., and subsidiaries was, at a minimum, $6,066,620.00. (Plaintiff's Exhibit 12).

74. There were no audited financial statements of First City Management, Inc and

subsidiaries available to verify stockholder's equity for 1996, 1997 or 1998. (Testimony of

Timothy Burke).

75. There was no credible evidence to support a decline in the stockholder's equity for

First City Management, Inc. and subsidiaries. (Testimony of the defendant).

76. The defendant is the owner of US Autobrokers, LLC (Testimony of Michael

Bridgman and Joseph Graziano).

77. US Autobrokers, LLC is in the business of leasing corvettes and does business as

Visone Corvette. (Testimony of the defendant, Michael Bridgman and Joseph Graziano).

78. US Autobrokers has a principal place of business at 108 Broadway, Saugus, MA.

(Exhibit 23, Testimony of the defendant, Michael Bridgman and Joseph Graziano).

79. The defendant denied his ownership interest in US Autobrokers for the purpose of

misrepresenting his true financial status. (Testimony of the defendant).

80. Anthony Visone, at a minimum, has a beneficial interest in the Broadway Realty

Trust. (Testimony of the defendant).

81. Anthony Visone, as Trustee of record for the Broadway Realty Trust, holds legal title

to the property at 7 Ferry Street, Everett, MA. (Exhibits 43, 44).

82. According to certain of Anthony Visone's personal financial statements, as of

October 31, 1995, the 7 Ferry Street property was valued at $175,000.00. (Exhibit 54(b)).

83. The 7 Ferry Street property is a three unit residential property, which generates

monthly rental income. (Testimony of the defendant; Exhibit 1).

84. The rental income derived from the 7 Ferry Street property has been diverted away

from the Broadway Realty Trust to and for the benefit of John and Rosita Visone, the defendant's

parents. (Testimony of the defendant).

85. Anthony Visone, as Trustee of Broadway Realty Trust, holds legal title to the property at 170-172 Chelsea Street, Everett, MA. (Exhibits 2, 43 and 44).

86. According to certain of Anthony Visone's personal financial statements, as of October 31, 1995, the 170-173 Chelsea Street property was valued at $425,000.00. (Exhibit 54(b)).

87. The 170-172 Chelsea Street property is a commercial rental property, rented to "Transmission World" for $4,000.00 per month. (Testimony of the defendant; Exhibit 2).

88. Anthony Visone, as Trustee of Broadway Realty Trust, holds legal title to the property at 188 Chelsea Street, Everett, MA. (Exhibits 5, 43 and 44).

89. According to Anthony Visone's personal financial statements, as of October 31, 1995, the 188 Chelsea Street property was valued at $475,000.00. (Exhibit 454(b)).

90. Anthony Visone, as Trustee of Broadway Realty Trust, holds legal title to the property at 108 Broadway, Saugus, MA. (Exhibits 3, 43 and 44).

91. According to Anthony Visone's personal financial statements, as of October 31, 1995, the 108 Broadway property was valued at $1,250,000.00. (Exhibit 54)b)).

92. Subject to certain lease obligations concerning the 108 Broadway property referenced within First City Management, Inc. and Subsidiaries 1995 Consolidated Balance Sheet, the Broadway Realty Trust received $180,000.00 in rent from Visone Motors Incorporated during 1995, and was entitled to receive the same rent during years 1995 and 1997. (Exhibit 4).

93. In or about January of 1998, the defendant, as Trustee of the Broadway Realty Trust, leased the 108 Broadway property to US Autobrokers, LLC for $30,000.00 in annual rent.

11

(Testimony of the defendant).

94. On July 29, 1988, the First National Bank of Boston granted a mortgage on 108 Broadway to Anthony Visone, as Trustee of Broadway Realty Trust, for the principal amount of $1,170,000.00. (Exhibit 43).

95. On March 5, 1997, the First National Bank of Boston mortgage was discharged. (Exhibit 54(a)).

96. As of November 18, 1998, the discharge of mortgage had not been recorded at the appropriate County Registry of Deeds. (Exhibits 43 and 44; Testimony of Robert J. Moriarty, Jr.).

97. After the plaintiff submitted evidence to this Court concerning such discharge of mortgage, the defendant, as Trustee of the Broadway Realty Trust and the sole beneficiary of the Spring Realty Trust, acquired a loan for $600,000.00 by further leveraging other properties and the 108 Broadway property, thus, adversely affecting his equity position. (Exhibits 43 and 44; Testimony of Robert J. Moriarty, Jr. and Anthony Visone).

98. Anthony Visone, individually, holds legal title to 12 Stillings Road, Saugus, MA.

99. As of February 18, 1998, the 12 Stillings Road property had an assessed final value of $198,200.00. (Exhibit 22).

100. The 'Baby T Nominee Trust' was established on October 13, 1998 through Declaration of Trust and is a revocable trust. (Exhibit 8).

101. 15 Tedford Lane, Lynnfield, MA was conveyed to the 'Baby T Nominee Trust' on October 14, 1993 for consideration of $500,000.00. There was no mortgage recorded in the Registry of Deeds a the time of this transaction, and, it was not until June 9, 1995, that the Baby

Nominee Trust recorded a mortgage from the defendant's father, John Visone, for "consideration paid". (Exhibit 50).

102. Louise San Filippo, as the Trustee of record for "Baby T Nominee Trust', holds apparent title to the 15 Tedford Lane property. (Exhibit 8).

103. Anthony Visone personally funded the 'Baby T Nominee Trust's' purchase of the said 15 Tedford Lane property. (Testimony of John Casey, Robert Gorton, and Victoria Guenther).

104. According to Anthony Visone's personal financial statements, as of October 31, 1994, the 15 Tedford Lane property was valued at $9000,000.00. (Exhibit 54(b)).

105. As of November 11, 1998, there were no mortgages of record concerning the 15 Tedford Lane property. (Exhibit 50; Testimony of Robert J. Moriarty, Jr.).

106. Louise San Filippo, as the Trustee of record for the Baby T Nominee Trust, is without independent information concerning the trust corpus, or the specific operation thereof. (Testimony of Louise San Filippo).

107. Michael McCarthy, as Trustee of Spring Realty Trust, holds legal title to the commercial property at 20 Spring Street, Saugus, MA. (Exhibit 48).

108. Anthony Visone is the sole beneficiary of the Spring Realty Trust. (Testimony Anthony Viola).

109. The 20 Spring Street property was originally conveyed to Anthony Visone, as Trustee of FCM Realty Trust on December 21, 1990. (Exhibits 18 and 48).

110. According to the defendant's personal financial statements, as of October 31, 1994, the 20 Spring Street property was valued at five hundred thousand dollars. (Exhibit 54(b)). .

111. The 20 Spring Street property was conveyed from Anthony Visone, as Trustee of FCM Realty Trust, without stated consideration, to Michael P. McCarthy, as Trustee of Spring Realty Trust on September 6, 1996. (Exhibit 48).

112. Subject to certain rental arrangements concerning the 20 Spring Street property referenced within the Fist City Management, Inc. and Subsidiaries 1995 Consolidated Balance Sheet, FCM Realty Trust received $62,606.00 in yearly rent from First City Acceptance Corporation during 1995. (Exhibit 4).

113. Michael J. McCarthy, as Trustee of Spring Realty Trust, is uninformed about the rental status of the 20 Spring Street property. (Testimony of Michael J. McCarthy).

114. The defendant, as Trustee of FCM Realty Trust, and Michael J. McCarthy, as Trustee of the Spring Realty Trust, effectively abandoned the 20 Spring Street property. (Testimony of Anthony Visone).

115. Such abandonment constitutes financial waste. (Testimony of Anthony Visone; Exhibit 4).

116. Anthony Visone, as Trustee of FCM 2 Realty Trust, holds legal title to the property at 25 Spring Street, Unit 4, Saugus, MA. (Exhibits 19 and 51).

117. As of November 11, 1998, there were no current encumbrances on this property. (Exhibit 51).

118. According to the defendant's personal financial statements, as of October 31, 1994, the 25 Spring Street property was valued at one hundred and thirty thousand dollars. (Exhibit 54(b)).

119. Anthony Visone, individually, holds title to the property at 382 Ocean Avenue,

14

Until 1209, Revere, MA. (Exhibit 46).

120. In or about 1987, the 382 Ocean Avenue property had an appraised market value of $165,000.00. (Exhibit 54B).

121. Michael P. McCarthy, as Trustee of Beach Realty Trust, holds legal title to the property at 89 Beach Street, Revere, MA. (Exhibit 47).

122. The 89 Beach Street property was conveyed on July 3, 1992 to Daniel Wilensky, then president of Visone Motors Incorporated, as Trustee of FCM 3 Realty Trust. (Exhibit 47).

123. As of October 31, 1994, the 89 Beach Street property was included on Anthony Visone's personal financial statement; that financial statement listed FCM Realty Trust as title record owner; and that property was valued at $485,000.00. (Exhibit 45(b)).

124. The 89 Beach Street property was conveyed on September 6, 1996 by Daniel Wilensky, as Trustee of FCM1 Realty Trust, without stated consideration, to Michael P. McCarthy, as Trustee of Beach Realty Trust. (Exhibit 47).

125. Sushi Realty Trust holds legal title to the property at 32 Perkins Street, Salem, MA. (Exhibits 12 and 49).

126. On September 20, 1996, through a foreclosure sale, Wamco XIX, LTD, of Waco, Texas conveyed this property to Peter Flynn, Trustee of Sushi Realty Trust, Nominee of Anthony Visone. (Exhibit 49),

127. On April 11, 1997, Peter Flynn resigned as Trustee of Sushi Realty Trust; and on June 6, 1997, Anthony Visone appointed Michael P. McCarthy successor of Sushi Realty Trust.

128. As of February 11, 1998, the 32 Perkins Street property had a final assessment value of $175,000.00. (Exhibit 13).

15

129. As of November 11, 1998, there were no encumbrances on this property. (Exhibit 49).

130. Robert Visone and Rosita Visone, as successor Trustees of the Car Realty Trust, hold legal title to the property at 72-74 Campbell Avenue, Revere, MA. (Exhibit 52).

131. The original Deed listed Anthony Visone as the grantee, but that listing was struck before recording. The recorded Deed identifies, in handwriting, that Michael P. McCarthy, as Trustee of Car Realty Trust, was granted the 72-72 Campbell Avenue, Revere, MA on December 30, 1996. (Exhibit 52).

132. On August 6, 1997, Michael P. McCarthy, as Trustee of Car Realty Trust, granted a mortgage interest on this property to TV Holdings, Inc. (Exhibit 52).

133. TV Holdings, Inc. was founded by Anthony Visone for the specific purpose of shielding his and his wholly owned companies' money and assets from prospective judgment creditors. (Testimony of the defendant).

134. Daniel Wilensky, as Trustee of the FMC3 Trust, holds legal title to the property at 3285 South East Street, Indianapolis, Indiana. (Exhibit 52).

135. Anthony Visone testified at trial that he is the sole beneficiary of the FCM3 Trust. (Testimony of the defendant).

136. As of October 31, 1994, the Indianapolis property was included on Anthony Visone's personal financial statement; that financial statement listed FCM3 Realty Trust as title record owner; and, that property was then valued at $1,100,000.00. (Exhibit 54(b)).

137. As of October 31, 1994, Anthony Visone owned commercial and residential real estate valued at $7,590,000.00; and his personal net worth totaled $15,344,107.00. (Exhibit

16

54(b)).

138. Anthony Visone, with the assistance of counsel and others, has deliberately attempted to alter the appearance of certain of his real estate and corporate holdings. (Testimony of the defendant, John Casey, Robert Gorton, Michael Bridgman, Joseph Graziano, Michael J. McCarthy and Anthony Viola).

139. The defendant has repeatedly attempted to thwart the plaintiff's right to the discovery of his true financial status, and has entered into an elaborate scheme to conceal his income and assets from the Court. (Testimony of the defendant and the plaintiff).

140. The defendant deliberately delayed these proceedings in order to avoid an increased support obligation during the 4 years and 3 months that this matter has been in litigation. (Testimony of the defendant and the plaintiff).

141. The property at 15 Tedford Street, Lynnfield, MA was listed as a $900,000.00 asset on the defendant's personal financial statement filed with the Century Bank. This property has never been listed as an asset on any of the defendant's financial statements filed with the Court. (Exhibits 54B, 27-33 and 37).

142. The defendant testified that there were encumbrances on the Broadway Realty Trust properties, when he knew those encumbrances had been discharged. (Testimony of the defendant and Robert Moriarty).

143. The defendant testified that there were encumbrances in excess of one million dollars on properties held by FCM 3 Trust when he knew no such encumbrances hd been existed. (Testimony of the defendant and Robert Moriarty).

144. The defendant testified repeatedly at trial that he had no ownership interest in US

17

Autobrokers, LLC, when he is the majority, if not sole owner of that entity. (Testimony of the defendant, Michael Bridgman and Joseph Graziano).

145. The defendant testified that he's "never changed ownership on any property [he's] been ... involved with" when in fact he transferred legal title of the property at 20 Spring Street, Saugus, MA to Michael McCarthy, Trustee of the Spring Realty Trust on September 6, 1996. (Testimony of the defendant and Exhibit 48)

146. Properties held by the FCM and FCM1 Realty Trusts were conveyed on September 6, 1996 to other Trusts without stated consideration for the purpose of concealing these assets. (Exhibits 47 and 48).

147. The defendant, after testifying that his daughter is the sole beneficiary of the Spring Realty Trust, transferred the beneficial interest to himself as the sole beneficiary. (Testimony of defendant, Anthony Viola, and the plaintiff's Exhibit 55.

148. The defendant offered perjurious testimony at trial. Initially the defendant claimed he paid no personal expenses out of the Broadway Realty Trust but in subsequent testimony admitted doing it. Initially the defendant testified he placed one certificate of deposit for $500,000.00 with TV Holdings, then in later testimony denied it. (Testimony of the defendant).

149. Initially the defendant testified he did not know the name of the trust that held legal title to the property at 25 Spring Street, but in later testimony he admitted that the FCM2 Trust held title to this property and that he was the Trustee. (Testimony of the defendant).

150. Attorney Kathleen M. Kelley's and Attorney James M. Kelley's hourly rate of $175.00 is consistent with their experience and expertise.

151. The rate of $175.00 per hour is a fair rate of compensation.

18

Many of the costs incurred and time expended in this litigation resulted from the deceptive practices of the defendant.

## CONCLUSIONS OF LAW

1. The Court shall apply M.G.L. Chapter 209C, which governs paternity actions, in determining an appropriate order of child support for the defendant.

2. In applying 209C the Court shall require "[e]ach person charged with support under this action ... to furnish support according to his financial ability and earning capacity pursuant to the provisions of this chapter." 209C, Section 1.

3. Child support guidelines are not meant to apply where ... the gross income of the non-custodial parent exceeds $75,000.00. In cases where income exceeds [this] limit, the court should consider the award of support at the $75,000.00 level as a minimum presumptive level of support to be awarded. Additional amounts of child support may be awarded at the judge's discretion. Massachusetts Child Support Guidelines (emphasis added).

4. "In the event that no guidelines are in effect, the court shall make such order as is in the best interests of the child, taking into consideration the financial ability and earning capacity of the parents of the child". 209C, Section 9(c).

5. The child support guidelines are designed to provide a standard of living the child would have enjoyed had the family been intact. They are further designed to meet the child's survival needs in the first instance, but to the extent either parent enjoys a higher standard of living to entitled the child to enjoy that higher standard. Child Support Guidelines.

6. This Court has the authority to consider the assets of the defendant in determining the amount of child support to be awarded. "Common sense and basic concepts of fairness support

19

the notion that ownership of an asset demonstrates ability to pay without further inquiry as to whether payment can be enforced directly against the asset." Krokyn v. Krokyn, 390 N.E. 2d 733, 737 (1979).

7. Where there is evidence that a defendant has transferred assets and he continues to benefit from these assets, the court is justified in finding any claim of impoverishment to be self imposed, and, thus, enabled to consider these assets in determining the amount of child support to be ordered. Cooper v. Cooper, 680 N.E.2d 1173 (1997).

8. The evidence presented before this Court establishes that the defendant has transferred numerous assets to various family members and friends, while continuing to reap the benefits of them.

9. Where both parents are responsible for child support, the assets and income, including potential income, of both parents should be considered in determining child support orders. Bassette v. Bartolucci, 38 Mass. App. Ct. 732, 652 N.E. 2d 623 (1995), citing Silvia v. Silvia, 400 N.E.2d 1330 (1980), Canning V. Juskalian, 597 N.E.2d 1074 (1992).

10. Whether a corporation's advances to its shareholders are bona fide loans depends on whether, at the time the advances are made, the shareholder intends to repay the corporation and the corporation intends to enforce the obligation. Crowler v. Cmr, 92-1 USTC Para.50,235 (1st Cir. 1992), aff'g T.C. Memo 1990-636.

11. Whether the requisite shareholder's intent to repay the corporation's advances was present at the time the advances were made is determined by examining objective evidence of the parties' intentions. Crowley v. Comr, 92-1 USTC Para.50, 235 (1st Circa. 1992), aff'g T.C. Memo 1990-636.

11. Factors which are examined to determine the intent of the parties include:

a. The extent to which the shareholder controls the corporation;

b. The earnings and dividend history of the corporation;

c. The magnitude of the advances;

d. Whether a ceiling exists to limit the amount the corporation advances;

e. Whether or not security is given for the advances;

f. Whether there is a set maturity date;

g. Whether the corporation undertakes to fore repayment;

h. Whether the shareholder is in a position to repay;

i. Whether the shareholder attempts to repay;

j. Whether interest is charged by the corporation;

k. Whether a certificate of indebtedness is given to the corporation;

l. Whether the terms of the agreement between the corporation and the shareholder establish an absolute and unconditional duty to repay; and

m. Whether the advances are proportionate to the shareholder's stock ownership; Alternate Foods, Inc. v. U.S., 505 F2d 873 (5th Cir. 1974), aff'g 73-2 USTC Para. 9792 (N.D. Ga. 1973); See also Crowley v. Comr, 92-1 USTC Para. 50, 235 (1st Cir. 1992), aff'g T.C. Memo 1990-636.

12. The determination whether the shareholder and the corporation intended the advance to be a loan or a dividend is an issue of fact. Crowley v. Comr, 92-1 USTC Para. 50, 235 (1st Cir. 1992), aff'g T.C. Memo 1990-636.

13. No single factor is determinative. Wang v. Commissioner, T.C. Memo. 1998-127;

Boecking v. Commissioner, T.C. Memo. 1993-497.

14. Where a shareholder has unfettered control over the corporation making loans to the shareholder, the loans are likely to be considered a constructive dividend. Wang v. Commissioner, T.C. Memo 1998-127. See also Epps v. Commissioner, T.C. Memo 1995-227.

15. Where nothing in the record of the case indicates that there were restrictions on the amount of money lent by the corporation to the shareholder, the loans are likely to be considered a constructive dividend. Crowley v. Commissioner, 962 F.2d 1077, 1081 (1st Cir. 1992), aff'g T.C. Memo. 1990-636.

16. Where there are no loan documents, notes or written instruments of indebtedness between the corporation and the shareholder, the loans are likely to be considered a constructive dividend. Crowley v. Commissioner, 962 F.2d 1077, 1082 (1st Cir. 1992), aff'g T.C. Memo 1990-636.

17. Where there are no repayment schedules, no maturity dates, no indication of interest payments, and no indication that the corporation received any security or collateral for the loans, then the loans are likely to be considered a constructive dividend. See Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963); see also Wang v. Commissioner, T.C. Memo 1998-127.

18. Where this support provider has reported earning less than he could with reasonable efforts, this Court may consider his potential earning capacity rather than his actual earnings in determining child support orders. Schuler v. Schuler, 382 Mass. 366, 416 N.E.2d 197 (1981).

19. There is evidence that the change in this defendant's financial circumstances is fraudulent and an attempt to avoid part of his obligation to support this child. An attribution of income in determining this defendant's child support order is justified.

22

20.  The guidelines indicate the judge is to consider the totality of the parties' circumstances is determining their support obligations. <u>Buckley v. Buckley</u>, 43 Mass. App. 716, 679 N.E.2d 596, 601 (1997).

21.  The defendant is an experienced businessman with assets and income worth several million dollars, and the plaintiff is a recent college graduate, who, in large part, has relied upon her parents to provide support for herself and this child.

22.  This court may make such judgment as it considers expedient relative to the care and maintenance of the minor child of the parties... G.L. Chapter 208, Sec. 28 M.G.L. Chapter 209C, Section 1.

23.  Probate Judges have broad discretion to fashion judgments in divorce proceedings that will best protect the interests and welfare of the parties' minor children. <u>Pare v. Pare</u>, 409 Mass. 292, 565 N.E.2d 1195, 1199 (1991); <u>Passemato v. Passemato,</u>___, Mass.___, 691, N.E.2d 549 (1988).

24.  It is well established that discriminatory treatment of children born out of wedlock, as compared with children born to parents married to each other, in matters of support ... will result in an unconstitutional denial of equal protection of the laws under the Fourteenth Amendment to the Constitution of the Uninest States. <u>Doe v. Roe</u>, 23 Mass. App. Ct. 590, 504 N.E.2d 659, 660 (1987).

25.  In keeping with <u>Doe</u>, supra, the minor child in the case before this court is entitled to that same protection afforded in <u>Pare</u>.

26.  The defendant has no income stream over which the court could exercise control in the form of a wage assignment.

27. The defendant has no liquid assets that may be secured through a trustee process to ensure this court's child support judgment.

28. As a general rule, support orders regarding the future payment of post high school educational costs are premature and should not be made. <u>Doe v. Roe</u>, 32 Mass. 63, 585 N.E.2d 340, 345 (1992).

29. Since the father deliberately delayed the proceedings in order to avoid an increased support obligation during the years that this matter has been in litigation, the Court does not abuse its discretion in ordering that the child support order issued after a full hearing on the merits be retroactively applied to the date of the filing of this complaint. Department of Revenue v. Foss, 45 Mass. App. Ct. 452, (Mass. App. Ct. 1998) 698 N.E.2d 1285.

30. "As a general rule in Massachusetts, a litigant must bear his own expenses except in so far as (1) a statute permits awards of costs ... or (2) a valid contract or stipulation provides for costs, or (3) rules concerning damages permit recovery of costs" (citations omitted) Fuss v. Fuss (No.1), 372 Mass. 64, 70, 368 N.E.2d 271 91977).

31. Children born out of wedlock are to be treated equally. G.L. 209C provides the legislative support necessary for allowing judges the discretionary powers to award legal fees in actions seeking support for illegitimate children as is permitted under G.L. Chapter 208, Section 38. Id.

32. In this case, the plaintiff is entitled to an be award of attorneys' fees. The plaintiff has incurred extensive legal fees in litigating this paternity action; much of which would have been unnecessary had the defendant provided an accurate financial statement to this court.

33. Pursuant to Rule 62 (g) (ii) of the Rules of Domestic Relations Procedure, [u]ness the Court otherwise orders, the filing of an appeal shall not stay the operation of any ... order or judgment of the court relative to custody, visitation, alimony, support, or maintenance."

6 - 7 - 99
_____
Dated

Judith Nelson Dilday
_____
Judith Nelson Dilday
Judge of Probate Court

25