1

Volume 1, Pages 1 - 49

Exhibits:  See Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------

UNITED STATES OF AMERICA

Plaintiff

vs.                    Docket No. CR No. 04-10123

ANTHONY VISONE

Defendant

-----------------------------

DEPOSITION OF GARRETT HARRIS

Thursday, January 5, 2006, 9:00 a.m.

Law Office of Albert F. Cullen, Jr.

60 K Street

Boston, Massachusetts

-------Reporter:  Kathleen L. Good, CSR, RPR-------

K. L. GOOD & ASSOCIATES

Post Office Box 367

Swampscott, Massachusetts 01907

Tel. 781-367-0815  Fax 781-598-0815

2

APPEARANCES:

U. S. Department of Justice

Tax Division

Susanne E. Sachsman, Attorney

Del Wright, Jr., Attorney

602 D. Street, NW

Washington, DC 20530

202-514-5085  Fax: 202-616-1786

susanne.e.sachsman@usdoj.gov

del.wright@usdoj.gov

Attorneys for the  Plaintiff

Law Office of Albert F. Cullen, Jr.

Albert F. Cullen, Jr., Attorney

Albert F. Cullen, III, Attorney

60 K Street

Boston, Massachusetts 02127

617-268-2240

Attorneys for the Defendant

3

1         P R O C E E D I N G S

2            GARRETT HARRIS, sworn

3            DIRECT EXAMINATION

4    BY MR. CULLEN:

5   Q.  Could we have your full name, please.

6   A.  Garrett Harris.

7   Q.  Mr. Harris, you're here pursuant to a subpoena

8       that you accepted service on; is that correct?

9   A.  Yes.

10   Q.  Let me show you a copy of the notice of

11       deposition subpoena and ask you whether that's a

12       copy of the subpoena you received.

13   A.  Yes, it looks like it is.

14          (Marked, Exhibit No. 1, Subpoena.)

15   Q.  This is a subpoena in a criminal case now

16       pending in the United States District Court for

17       the District of Massachusetts entitled United

18       States of America against Anthony Visone,

19       Criminal No. 04-10123.  And it's being taken

20       pursuant to an order of Judge Woodlock.

21          I don't know whether you have seen that

22       order.

23   A.  No, I haven't.

24          (Marked, Exhibit No. 2, Order.)


                         4

1   Q.  Pursuant to that subpoena to you, it asks you to

2       produce certain records and you have produced

3       the records requested in that subpoena.

4   A.  Is that a question?

5   Q.  Yes.

6   A.  Yes.

7   Q.  We've made copies.  Is this a copy of what was

8       contained in your file?

9  A.  Yes.  It looks like it is.

10      (Marked, Exhibit No. 3, Group of

11    Documents.)

12  Q.  What is your occupation, Mr. Harris?

13  A.  I'm an attorney.

14  Q.  By whom are you employed?

15  A.  Gallagher & Associates, PC.

16  Q.  What is your position in Gallagher & Associates?

17  A.  I guess, technically, senior associate.

18  Q.  For how long have you been employed by Gallagher

19    & Associates?

20  A.  I's been employed by them and their predecessor,

21    Gallagher & Gallagher, PC, since 1986.

22  Q.  As an attorney having been employed for 19 years

23    in the practice of law, are you familiar with

24    depositions?

5

1  A.  Yes.

2  Q.  Have you taken depositions in the past?

3  A.  Yes.

4   Q.  Have you ever been a deponent?

5   A.  Once.

6   Q.  So it's not necessary for me to go over what the

7       witness's role is at a deposition?

8   A.  Let's hope not.

9   Q.  What type of practice do you engage in?

10  A.  Civil litigation, largely in the area of

11      insurance law, insurance coverage, disputes,

12      fraud, issues with insurance agents and other

13      similar commercial business type litigation.

14  Q.  Have you ever engaged in the practice of

15      criminal law?

16  A.  I have not.

17  Q.  Could you tell me to what bars you've been

18      admitted.

19  A.  The Commonwealth of Massachusetts, the U. S.

20      District Court for Massachusetts and the U. S.

21      First Circuit.  And then occasionally particular

22      cases in New Hampshire.  Just New Hampshire,

23      actually.

24  Q.  Admitted pro hoc vice?

6

1  A.  Exactly.

2  Q.  Now, at some point in time, was Gallagher &

3      Gallagher served with a subpoena to produce

4      certain records to the federal Grand Jury?

5  A.  In the Visone case?

6          Gallagher & Associates was.  It was

7      Gallagher & Associates at that time.

8  Q.  Was that subpoena served upon you?

9  A.  I cannot remember exactly how it was served,

10     whether -- I think a marshal may have dropped it

11     off.  I've been trying to remember and I can't

12     remember.  I can't remember if a marshal dropped

13     it off or if it came in the mail.  And it was

14     not served directly physically on me.  It was

15     addressed to, as I read it here, the custodian

16     of records, but since I had been the -- to the

17     extent there was any custodian of the subpoenaed

18     records, it was me.  I took it to have been

19     served on me, if not physically, at least

20      indirectly.

21   Q.  With respect to that subpoena, it requested you

22      produce all non-privileged documents and

23      records, including, but not limited to court

24      pleadings, discovery materials, deposition


7

1      transcripts, trial tapes and trial transcripts

2      concerning Anthony Visone.

3            Is that correct?

4   A.  I think you read it correctly, yes.

5   Q.  Were you familiar with any matters that

6      Gallagher & Associates was handling that

7      concerned Anthony Visone?

8   A.  There was an insurance case that we had handled

9      in which Mr. Visone and several of his

10      corporations were defendants, so I was familiar

11      with that case which had been, I believe -- I'm

12      quite sure had actually been settled maybe even

13      a few years before we received the subpoena.

14   Q.  Was that the only matter that you were handling

15    that concerned Anthony Visone?

16  A.  Yes.

17  Q.  Let me just jump ahead.  This asks for all

18    non-privileged documents and records.

19        Were there any documents and records

20    that you did not produce because they were

21    privileged?

22  A.  The only documents that were not produced were

23    communications between our office and the three

24    insurance companies who are our clients in that


                        8

1    case, which were largely status reports and

2    things like that.

3  Q.  Did you prepare a log of the privileged

4    documents?

5  A.  I did not, no.

6  Q.  Are the privileged documents still in existence?

7  A.  Most of them are, yes.

8  Q.  Has the government had the opportunity to review

9    those privileged documents?

10  A.  No, they have not.

11        (Marked, Exhibit No. 3A, Subpoena.)

12  Q.  Did you, in fact, work on the litigation

13      involving Mr. Visone?

14  A.  Yes, I did.

15  Q.  Who was the lead attorney or the partner in

16      charge of that case?

17  A.  Owen Gallagher.

18  Q.  Now, did any other associates or partners work

19      on that case?

20  A.  Over time, it was a case that went on for, I

21      think, about six years, maybe more, so over

22      time, there were people who worked on bits and

23      pieces of it, gathering documents, preparing

24      motions and so on.


                        9

1        But I'm quite sure that just about

2      anybody who worked on that case is no longer

3      with us.

4        So it was mainly Owen Gallagher and I

5      and another, at least one or two other lawyers

6      who worked on it, but, again, they're not with

7      Gallagher & Associates anymore.

8   Q.  Now, with respect to the subpoena, can you tell

9      me when you received the subpoena?

10  A.  I believe I received it -- I'm referring to one

11      of my letters to refresh my memory because I

12      cannot remember independently of it -- I think I

13      received it on April 26, 2004, and if it wasn't

14      that day, it may have been the day before.

15          But it was on or about that date.

16  Q.  What did you look at to refresh your memory?

17  A.  My letter of April 26, 2004, to Sandra Lemanski.

18  Q.  At the time you received the subpoena, did it

19      have the handwritten notation that appears in

20      the box labeled date and time?

21  A.  I am quite certain that it did.  I'm sure that

22      it did.

23  Q.  When you received the subpoena, what did you do?

24  A.  As best as I can recall, what I think I did was

1     I called Sandra Lemanski, whose business card

2     was attached to the subpoena.

3   Q.  Did you do any search of your records at that

4     time to determine whether you had the files that

5     were being requested?

6   A.  Yes, I did.

7   Q.  And how did you search for them?  Are you on a

8     computer?

9   A.  Mainly what I did was we had, I believe, at

10     least one file cabinet that had records relating

11     to the Visone case and probably two additional

12     file drawers that were actually my file drawers

13     that had material from that case in it.

14   Q.  Do you have a record of your files on any

15     computer?

16   A.  What do you mean?

17   Q.  Listing of all the, by either client,

18     defendant -- basically for a conflicts search?

19   A.  I'm still not sure what you mean.

20   Q.  How do you determine that you don't have a

21     conflict in a case when you receive a new case?

22  A.  Well, we check it against previous cases and --

23  Q.  Are those listed on a computer?

24  A.  They are, yes.  The cases with the parties and

11

1      so on, yes.

2  Q.  Did you do anything such as that in this case?

3  A.  In which case?

4  Q.  An inventory of any cases involving Mr. Visone?

5  A.  No, I did not, because the only one, having

6      worked in the office for, as you pointed out, 19

7      years, the one Visone case was the only case I

8      knew that we had handled of my own knowledge so

9      I did not search, do a conflict type search, no.

10  Q.  Had you ever been subpoenaed to testify or

11      appear before a Grand Jury or produce records to

12      a Grand Jury in the past?

13  A.  No.

14  Q.  So this is the first time that you had received

15      such a subpoena?

16  A.  Yes, it is.

17  Q.  When you called Ms. Lemanski, did you speak to

18     her?

19  A.  Yes, I did.

20  Q.  I note in your letter, just to be clear, that

21     you said:

22         "Following up on my voice mail message."

23  A.  I -- sorry.

24  Q.  When you first called her, did you speak with


                              12

1     her?

2  A.  My best recollection, again, relying almost

3     exclusively on these letters, is that I called

4     and left her a voice mail message and then heard

5     back from her and, again, just going by the two

6     letters dated April 26, 2004, and April 27,

7     2004, I believe she called me back the next day

8     on April 27.

9  Q.  Do you recall what you said in your voice mail

10     message?

11  A.  I can't recall.  I certainly can't recall

12     exactly.  And the gist of it, again, based on

13     these letters, was along the lines of we were

14     happy to do -- not happy, but willing to do

15     whatever made sense as far as responding to the

16     subpoena, with my main concern just being the

17     volume of the material that we had and whether

18     they wanted us to bring all of it or a subset of

19     it or none of it or what.  What was the most

20     efficient way to respond to the subpoena.

21  Q.  Do you recall what she told you?

22  A.  Again, I cannot recall exactly, although the

23     gist of it was that we did not need to

24     physically appear at the court on April 28 and


13


1     that she would get back in touch with me or

2     somebody would get back in touch with me about

3     reviewing the records, whether at our office or

4     at some other location.

5  Q.  After that conversation, you then sent this

6     letter of April 26?

7   A.  April 27 was after the conversation, as best as

8      I can recall.

9   Q.  Well, I'm looking at a letter dated April 26

10      that you first sent, which states that, in the

11      first line:

12          "Following up on my voice mail message

13      this morning and our previous telephone

14      conversation."

15   A.  Yes.  The previous telephone conversation was,

16      as best as I can recall, is I think she had

17      called me at some point prior to April 26 and

18      told me that we were going to be getting a

19      subpoena so she had alerted me to that; that

20      there was going to be a subpoena for our

21      records.

22          So that was a discussion I had with her.

23          But now that I'm looking at the April 27

24      letter, just to clarify something, I think I

14

1      said a few moments ago, I think the -- I did not

2       have a one-on-one conversation with her after

3       the April 26 fax.  I think she had left me a

4       voice message telling me what I had just related

5       to you, that we did not need to physically

6       appear at the court on April 28 and she would be

7       getting back in touch with me about looking at

8       the records.

9    Q.  Let me try to put in order what you've stated.

10          Sometime prior to April 26, Ms. Lemanski

11      called you and stated that she would be sending

12      over a subpoena for records relating to Anthony

13      Visone?

14   A.  Yes, as best I can remember.

15   Q.  At that time, you had not received a subpoena?

16   A.  As best I can remember, yes.

17   Q.  In that conversation, did she ask you to produce

18      the records without a subpoena?

19   A.  I do not recall her asking that.  I think it

20      was, as I said, just alerting me to the fact

21      that they were going to serve a subpoena for

22      those records.

23  Q.  Then sometime subsequent to that telephone call,

24      you, in fact, received the subpoena?

15

1  A.  Yes.

2  Q.  And obviously, you received that subpoena either

3      on the 26th or a day or so before?

4  A.  Yes.

5  Q.  Is it after receiving the subpoena, you then

6      called Ms. Lemanski on the morning of April 26?

7  A.  Yes.

8  Q.  And what did you inform her in that voice mail

9      message on the morning of April 26?

10  A.  As I said earlier, it wasn't so much informing

11      her, it was more inquiring as to how they wanted

12      us to handle this as far as whether to deliver

13      all the documents to the court on the 28th or if

14      there was some particular subset of documents

15      that they were most interested in, you know.

16          And I can tell you if I hadn't heard

17      back from her, I probably would have just either

18    delivered the records to the court that day or I

19    think there was some provision in here for

20    mailing all the records.  The concern was just

21    the volume of the material.  I just wanted to

22    see what they wanted.

23  Q.  I note in your letter of April 26, 2004, you

24    also said:


16

1        "Otherwise, please let know if we can

2    have an additional week."

3  A.  Yes.

4  Q.  Was there any response to that request?

5  A.  Well, the response to that request was, as best

6    I can remember, the voice mail message I

7    received probably on April 27 from her saying we

8    did not need to be at the court the next day and

9    that she would be back in touch with me as far

10    as making arrangements to review or get the

11    records.

12  Q.  When she told you she'd be back in touch, did

13     she give you a time period?

14   A.  She may have and I don't recall.

15          (Marked, Exhibit No. 3B, Letter,

16     4/26/04.)

17          (Marked, Exhibit No. 3C, Letter,

18     4/27/04.)

19   Q.  Did you ever speak to the assistant U. S.

20     Attorney, Mark Balthazard?

21   A.  Not in anything having to do with this.  I think

22     years ago I had a bankruptcy matter he was the

23     U. S. Attorney on.  I think I talked to him.

24   Q.  Nothing in connection with this subpoena?


17


1   A.  No, no.

2   Q.  In your letter of April 27, you confirm a

3     conversation you had with Ms. Lemanski where she

4     told you it was not necessary for you to appear

5     in court or produce any documents in court

6     tomorrow.

7   A.  Yes.

8  Q.  Did she release you from the subpoena at that

9     time?

10  A.  I do not remember if she used the word "release"

11    explicitly but it was certainly my understanding

12    after that conversation that we were released

13    from appearing the next day in court.

14        I did not take it to mean that we were

15    wholly released from the subpoena because I

16    just -- I just have no recollection of it being

17    discussed in that context.

18  Q.  Would you have produced the documents without a

19    subpoena?

20  A.  I can't think of any reason why we wouldn't

21    have, so probably.

22  Q.  Have you ever produced documents relating to

23    your files without a subpoena?

24  A.  You know -- let me see.  I'm trying to recall

18

1    specific instances.  I think over the years

2    there have been occasions where an attorney with

3      a similar case involving similar parties, you

4      know, more or less as a professional courtesy,

5      if it's just been pleadings that have been filed

6      in court or other documents, public records or

7      other documents that I'm not under any

8      restriction from showing them to anybody, I

9      think there have been occasions when I've done

10     that.

11             I think there have been occasions where,

12     like, I've had a civil case and somebody else

13     has had a bankruptcy case and I've made

14     information available.  Nothing privileged or

15     nothing client sensitive or anything like that,

16     but if it's stuff that's largely public records

17     or on file with the court or whatever, I think

18     so, yes.

19             I can't think of a specific instance.

20  Q.  And in this case, you were familiar with the

21     case?

22  A.  Familiar with which case?

23  Q.  With the case involving Anthony Visone.

24  A.  With our civil case involving Anthony Visone,

19

1    yes.

2  Q.  Were you aware that there was an order from the

3       probate court of Massachusetts with respect to

4       certain records that were produced in the

5       probate court proceeding?

6  A.  I think there were records, yes.  I think there

7       was a paternity case that there were records

8       under seal.

9  Q.  Do you recall that, in fact, when you moved to

10      have those records released, that it was

11      initially denied by the probate court?

12  A.  I was not involved in the case at that point.

13  Q.  I'm asking you if you knew.

14  A.  I recall something like that, yeah, which I

15      think we appealed, I think.

16  Q.  As a result of that appeal, you were given the

17      right to look at the information?

18  A.  I believe that was the case.  As best I can

19      recall.  Again, I was not working on the case at

20    that time.

21   Q.  Do you recall whether there was an order that

22     you were under with respect to that information

23     in revealing that information to anyone?

24   A.  I don't recall, no.


20

1   Q.  You don't recall whether at the time that you

2     were under an order with respect to the

3     confidentiality of records that would be

4     produced to you?

5   A.  I don't recall, no.

6   Q.  If you were under such an order, would you have

7     produced records without a subpoena?

8   A.  Under an order -- no.

9   Q.  By the way, do you have any notes of your

10     conversations with Ms. Lemanski other than the

11     letters that you have produced?

12   A.  No, I don't.

13   Q.  Do you have any records of telephone calls that

14     you had with Ms. Lemanski in 2004?

15  A.  No, I don't.

16  Q.  Do you keep a log or a diary with respect to

17      your telephone conversations?

18  A.  No, I don't.  I don't keep a record of each

19      conversation, no.

20  Q.  Do you keep billing records where, in fact, you

21      write down that you spent six minutes or more

22      talking to Ms. Lemanski?

23  A.  Yes.

24  Q.  Did you produce those billing records?


                              21

1  A.  I did not, no.

2  Q.  Do you have those billing records?

3  A.  Yes.

4  Q.  Is there any reason why they were not produced?

5  A.  Well, I didn't see them within the two

6      categories of the documents that you sought to

7      be produced here.

8          And then my other issue with those would

9      be those are invoices sent directly to clients

10    and would be regarded as being in the nature of

11    an attorney/client communication.

12  Q.  I don't want to argue with you with respect to

13    what was or was not to be produced.  I think the

14    subpoena calls for them, and then if you assert

15    a privilege, it does ask for a log.

16        Maybe we can discuss that later to see

17    if we can -- I'm not interested in anything

18    other than contacts with Ms. Lemanski or other

19    government agents or attorneys.  So maybe we can

20    arrive at an agreement.

21        When did you next hear from anyone with

22    respect to these records?

23  A.  I believe the next time I heard from anyone from

24    the government, from the federal government

22

1    regarding the records was in -- again, this is

2    almost relying exclusively on my letters -- the

3    letter, June 8, 2005, a fax that I sent to

4    Sandra Lemanski because we still had the Visone

5    material and I had a stack of it in my office,

6    which had been sitting there, and so I sent her

7    a fax just to see if the government was still

8    planning to look at the files or obtain them or

9    whatever.

10        And I think I heard back from her pretty

11    shortly after I sent the fax, if not the same

12    day, the next day, I believe.  It was pretty

13    soon after that.

14  Q.  When you say the fax, you're referring to your

15    letter of June 8 --

16  A.  June 8, yes.

17  Q.  -- 2005?

18        (Marked, Exhibit No. 3D, Fax, 6/8/05.)

19  Q.  Now, I note in that letter, you state in the

20    letter to Ms. Lemanski:

21        "Following up on our communications in

22    April 2004, please let me know whether you plan

23    to review our files pursuant to the government's

24    Grand Jury subpoena concerning Anthony Visone."

1          Is that correct?

2   A.  Yes.

3   Q.  And at that time, when you wrote that letter,

4       did you believe you were producing these records

5       pursuant to the Grand Jury subpoena?

6   A.  Yes.

7   Q.  Would that refresh your memory as to whether you

8       had any agreement that you were released from

9       the subpoena?

10   A.  Well, that's why I said earlier, I just -- as

11       best I can recall, I don't think I had an

12       understanding that I was explicitly released

13       from the subpoena.  I just had an understanding

14       that I was released from having to, or someone

15       from Gallagher & Associates, having to bring all

16       the records to the court on April 28, 2004, or

17       shipping them en masse to Ms. Lemanski or

18       someone else working with her.

19   Q.  Did you ever inquire of Ms. Lemanski at or about

20       June 2005, whether the Grand Jury was still in

21    session?

22  A.  I did not, no.

23  Q.  Did you know at that time that Mr. Visone had

24    been indicted?


                        24

1  A.  No, I did not, as best I can remember, no.

2  Q.  Had she ever mentioned to you prior to June 8,

3    2005, that Mr. Visone had been indicted by a

4    federal Grand Jury for criminal tax violations?

5  A.  To the best of my memory, no.

6  Q.  And you never inquired when you received the

7    subpoena as to what was the purpose of the Grand

8    Jury's inquiry?

9  A.  I did not, no.  When I say no, I mean n-o.  I

10    guess it's the same answer the other way.

11  Q.  And you say that you received the call back from

12    Ms. Lemanski after you faxed this letter; is

13    that correct?

14  A.  As best I can remember, yes.

15  Q.  Do you recall what that conversation was?

16  A.  As best as I can remember, the gist of it was

17     that, to hold on to the records and that she

18     would, again, she or somebody from possibly from

19     the U. S. Attorney's Office would be back in

20     touch with me as far as making arrangements to

21     look at them, to come to our office to look at

22     them.

23  Q.  When was the next contact that you had?

24  A.  Some point, I believe, within a month of that

25

1     June 8, 2005, fax and whatever subsequent

2     conversation I had with Ms. Lemanski, I think I

3     next heard from Del Wright.  I think if it

4     wasn't Del Wright, it was Sandra Lemanski, but

5     one or the other got in touch with me sometime

6     in, I believe it was early July of 2005.

7  Q.  Did you have a conversation with them?

8  A.  Yes.

9  Q.  Do you recall that conversation?

10  A.  And I think the conversation was along the lines

11    of setting up some time shortly after that, in

12    or about July of 2005, where they -- by "they,"

13    I mean Mr. Wright or Ms. Lemanski -- were going

14    to come to our office to review the records.

15  Q.  Did anybody request that you send them certain

16    records?

17  A.  Yes.  Again, this is my best memory, is that

18    prior to the time that we had set for the

19    meeting, I think I received a call from

20    Mr. Wright.  And I'm relying almost entirely on

21    my July 6, 2005, letter that went with a Federal

22    Express package to Mr. Wright, where in a

23    conversation I believe I had with Mr. Wright or

24    Ms. Lemanski -- I'm pretty sure it was with


26

1    Mr. Wright -- he indicated that he was

2    interested in getting copies of any deposition

3    transcripts in the Visone civil case that we

4    handled as well as affidavits.  And so on July

5    6, 2005, I sent him the Federal Express package

6        with those documents.

7            (Marked, Exhibit No. 3E, Letter,

8        7/6/05.)

9    Q.  I note in your letter of July 6, 2005, that you

10       state that you're producing these records in

11       response to and in compliance with the

12       government's Grand Jury subpoena concerning

13       Anthony Visone.

14           Is that correct?

15   A.  Yes.

16   Q.  Was it your understanding at that time you were

17       so doing?

18   A.  That I was producing the documents in response

19       to and in compliance with the government's Grand

20       Jury subpoena?  Yes.  That was my understanding

21       at the time.

22   Q.  After sending this letter, did you ever have a

23       conversation with Mr. Wright wherein he informed

24       you that he thought there was an agreement to

27

1     produce the records and that you had been

2     released from the subpoena?

3   A.  I don't recall that, no.

4   Q.  Did you have a conversation with Ms. Lemanski,

5     other than the one you've told us about, wherein

6     she stated that you had been released from the

7     subpoena?

8   A.  I don't remember that, no.

9   Q.  Did you receive a response from her after you

10     sent this letter of July 6, 2005, saying to you,

11     words to the effect that you were released from

12     the subpoena, you've agreed to produce them

13     without a subpoena?

14   A.  I don't remember that, no.

15   Q.  Did you ever have any such conversation with any

16     member of the government?

17   A.  I don't recall any conversation with any member

18     of the government where it was said expressly

19     that I was released from the subpoena.  I don't

20     remember that occurring.

21   Q.  When you say you don't remember, do you recall

22     any such conversation wherein it was discussed?

23  A.  I just don't recall any such conversation, no.

24  Q.  In your conversation with Mr. Wright at this

28

1     time, did he tell you that Mr. Visone had been

2     indicted by the Grand Jury?

3  A.  I don't -- he may have and I just don't remember

4     as I sit here today.

5  Q.  Did Ms. Lemanski tell you that Mr. Visone, at or

6     about this time, that Mr. Visone had been

7     indicted?

8  A.  I don't remember being so informed, no, at that

9     time.

10  Q.  Did either of them tell you that a trial was

11     scheduled in the near future with respect to

12     Mr. Visone?

13  A.  At some point, I was told that a trial was

14     scheduled, I think for this month, for January,

15     but I don't think that was until -- I don't

16     think that was until later, until September,

17     October, 2005.

18  Q.  I'll get there.

19       You also produced a phone record that

20       shows on July 6, a telephone call to Washington,

21       DC?

22  A.  Yeah.  My best recollection of that is that

23       Mr. Wright -- because I believe that's

24       Mr. Wright's phone number -- had called me and


                          29

1       that was where we had the conversation, I guess

2       it was him, Mr. Wright, who had indicated to me

3       that he was interested in getting copies of the

4       deposition transcripts and the affidavits from

5       the civil case that we had handled and that was

6       what generated the Federal Express package I

7       sent on July 6, 2005.

8   Q.  Do you have any record of sending that -- I

9       didn't see it in the package -- FedEx receipt,

10       weigh bill?

11  A.  No.  We may possibly have the receipt from that.

12       But I did not produce it today, but now that you

13    mention it, it's possible that we may -- that I

14    still have that.

15  Q.  If you do have that, could you send a copy to

16    myself and Mr. Wright?

17        MR. CULLEN:  For the record, when I was

18    referring to telephone record, it's part of

19    Exhibit 3 and it has an invoice date of 7/31/05.

20  Q.  After you sent these records down to Mr. Wright,

21    were you again contacted?

22  A.  Yes.  Sometime in September or October, I

23    received a call from -- again, I can't remember

24    if it was Ms. Lemanski or Mr. Wright -- saying


30

1    that -- I think it would have been Ms. Lemanski,

2    saying her and Mr. Wright wanted to set up a

3    time to come to our office to review the files

4    from the Visone case, Visone civil case.

5  Q.  By the way, in Exhibit 3, you produced, I think,

6    a certificate of authenticity of business

7    records.

8  A.  Yes.  That was attached to the subpoena that we

9    received in April 2004.

10  Q.  Was that ever completed?

11  A.  No.

12  Q.  Did they come to your office?

13  A.  Yes.

14  Q.  Do you recall when that took place?

15  A.  I believe that was sometime a few days before

16    October 24, 2005.

17  Q.  Do you have any notes relating to that visit?

18  A.  Yeah.  Probably -- I probably had it noted in my

19    diary and that is -- yes, I probably have it --

20    it was a few days before October 24, on or

21    around that time.

22  Q.  Who came to your office?

23  A.  Mr. Wright and Ms. Lemanski.

24  Q.  Did you show them the records at that time?

31

1  A.  Yes.

2  Q.  How long did they spend at your office?

3   A.  I think they were at our office for about an

4      hour, an hour and a half.

5   Q.  Did you have any conversation with them at that

6      time?

7   A.  Yes.

8   Q.  Could you tell me what the conversation was and

9      identify the person who was speaking?

10   A.  As best as I can remember, it was largely small

11      talk just about Boston and Washington.  I think

12      it was at or about that time that they indicated

13      to me that there was to be a trial in January

14      and I think they may have asked me a bit about,

15      maybe a little bit about the content of the

16      files.  It was mainly the transcripts, court

17      pleadings and documents that we had obtained by

18      subpoena in the civil case and I think they

19      asked me about some of the deponent parties.

20          I can remember they -- for some reason,

21      I can remember they asked me about a guy named

22      Andrew Dalbo, and even though I took the guy's

23      deposition, then and now, all I can remember is

24    I took the deposition of a guy named Andrew

32

1    Dalbo.

2         It was largely a matter of, I had the

3    files out on the conference table and made them

4    available for them to look at.  And then at some

5    point, because I wasn't in the conference room

6    with them the whole time, I was in my office,

7    and at some point, they let me know that what

8    they wanted me to do was just to ship the files

9    down to Mr. Wright in Washington, which is what

10    I did.

11    Q.  Again, do you have any records relating to the

12     shipment of those files, your letter says by

13     Federal Express?

14    A.  We probably have the Federal Express weigh bill

15     or records for it.

16    Q.  Could I obtain a copy of that, please?

17    A.  Yeah.

18    Q.  Were you producing those records pursuant to the

19    Grand Jury subpoena that you had received?

20  A.  That was my understanding, yes.

21  Q.  At any time, were you informed that the Grand

22    Jury had expired?

23  A.  No.  Not at that time.  I think at some point,

24    you know, in connection with these proceedings,

33

1    you subpoenaing me, I think someone had

2    mentioned it to me.  It may have been you.  I'm

3    not sure.

4  Q.  After sending the file in October, did you have

5    any further contact with either Ms. Lemanski or

6    Mr. Wright?

7  A.  I don't think I had any further contact with

8    Ms. Lemanski since then.  I think after that,

9    between then and now, I think I received one

10    call from Mr. Wright, and my best memory of it

11    was something along the lines of there was a

12    chance that they might possibly need me to

13    testify at the civil trial for purposes of

14    authenticating some of the records.  I think

15    that's what it was.

16        And then it was just, well, you know, as

17    I understood it, I would just hear from

18    somebody.

19  Q.  Do you recall when that conversation took place?

20    Let me show you the phone record.

21  A.  Yeah.  There's one phone record.  I think it may

22    have been -- I think it may have been,

23    obviously, on November 1, I placed a call to

24    Mr. Wright.  And so I think maybe one of these

34

1    things where he called me up and asked me to

2    give him a call and I called him back and you

3    can see the conversation was .8 minutes so it

4    was a short thing.

5  Q.  I assume that refers to .8 of an hour?

6  A.   .8 of a minute.

7  Q.  Do you recall, was it that conversation that

8    Mr. Wright told you that he would probably need

9      you as a witness to authenticate certain

10     records?

11  A.  I don't think he said probably.  I think it was

12     possibly.  I think.

13  Q.  Anything further said at that time?

14  A.  No, no.  I believe that was the substance of

15     that entire conversation and -- yeah, that was

16     it.

17          That's the only thing I can remember of

18     my conversation.

19  Q.  Have you had any, since that November

20     conversation, have you had any further

21     conversations with either Ms. Lemanski,

22     Mr. Wright or any other representative of the

23     government or Department of Justice?

24  A.  Yes.  There have been two that I can recall.


                            35


1      The first one was a few weeks ago when you had

2      called Owen Gallagher and left a message about

3      the possibility of deposing him, I guess was the

4      initial call that you had made in connection

5      with the Visone case.  He said that he had

6      received that call.  He told me that he had

7      received that call.  And mainly because I had

8      spoken with him on a few other occasions, I

9      called Mr. Wright just to see if he could tell

10     me, give me a heads up as to what was going on.

11           And as I recall, when I identified

12     myself, he put me on speaker phone and had some

13     other people from his office come in and I asked

14     him why he was doing that and I recall he said

15     something that he just -- because of this

16     controversy in the Visone criminal case, he just

17     wanted to make sure that there was no issue as

18     to whether he would influence me at all -- I

19     guess it was my understanding that he was aware

20     you were going to depose somebody from our

21     office and what he expressed to me was along the

22     lines of he just wanted to make sure that I

23     wasn't influenced in my testimony in that

24     connection by talking with him.

36

1          And so I basically said to him, it

2     doesn't sound like -- it doesn't make sense for

3     us to have any phone conversation and the call

4     more or less terminated at that point as I

5     recall it.

6          Then I think you -- it may have been the

7     same day that I received a call from you.

8          And then the only other conversation

9     I've had is, I think it was yesterday,

10    Ms. Sachsman called me more or less inquiring

11    about the records that we were going to produce

12    today.  And I just gave her chronologically the

13    documents that I had and she asked me maybe two

14    or three other questions about, more or less,

15    was it my understanding I was producing the

16    documents in connection with the Grand Jury

17    subpoena which, to the extent I thought about it

18    at all, it was, and whether I would have made

19    them available voluntarily, and in which case I

20    told her the same thing I told you a few moments

21    ago, is that, you know, with certain exceptions,

22    I couldn't think of a particular reason why I

23    would not but I just -- I saw it as in

24    connection with the subpoena.


37

1  Q.  But you didn't produce them voluntarily.  I

2     think you stated you produced them pursuant to

3     the Grand Jury subpoena.

4  A.  Yeah.  I did not see it as a voluntary

5     production, no.

6  Q.  When Ms. Lemanski first contacted you, she

7     didn't ask you to produce the documents

8     voluntarily.  She told you a subpoena would be

9     coming over for the records?

10  A.  My best recollection, yes.

11        MR. CULLEN:  I have nothing further at

12     this time.  I do want to discuss the issue

13     relating to the billing records and the

14     privileged documents.

15        MR. WRIGHT:  Can we take a five-minute

file:///C|/Documents%20and%20Settings/Albert/My%20Documents/Visone/harris010506/Harris010506.txt

16    break?

17         (Recess.)

18         MS. SACHSMAN:  We just have a couple of

19    quick questions.

20

21

22

23

24


38

1         CROSS-EXAMINATION

2     BY MS. SACHSMAN:

3    Q.  I'm going to bring you back to your April 27,

4     2004, letter and conversation with at Sandra

5     Lemanski.

6    A.  Okay.

7    Q.  When Ms. Lemanski contacted you on April 27,

8     2004, isn't it true that what she said was you

9     would not need to appear in court or produce any

10    documents directly to her so long as you agreed

file:///C|/Documents%20and%20Settings/Albert/My%20Documents/Visone/harris010506/Harris010506.txt

11    to permit the government to come to your office,

12    review the documents there and then produce

13    copies later?

14  A.  She may have said that.  I just can't remember.

15    I can't remember exactly what she said.  But I

16    can't categorically deny that she said that or

17    something like that.  I just can't remember.

18  Q.  In your letter, you explain that you're

19    confirming her statement that your office will

20    not need to appear in court or produce any

21    documents in court tomorrow but will wait to

22    hear from you as to when you would, "you,"

23    meaning Ms. Lemanski, would be available to

24    review the records in your office.

39

1  A.  Yes.

2  Q.  Correct?

3  A.  That's what I wrote, yes.

4  Q.  And that reflected a conversation that you had

5    had with Ms. Lemanski?

6   A.  I think that reflected a phone message she had

7      left me.

8   Q.  And the phone message had told you that you

9      would not need to show up in court, correct?

10  A.  Yes.  As I remember it, yes.

11  Q.  And that she would be coming to your office to

12     review the records there, correct?

13  A.  More or less, yes.

14  Q.  Did you ever ask for any additional subpoena?

15  A.  Did I ask for a subpoena?  No.

16  Q.  Did anyone ever make mention of the subpoena

17     after that April 27 conversation?

18  A.  Anyone from the government?

19  Q.  Yes.

20  A.  I can't -- I don't remember one way or the

21     other.  I don't remember the subpoena being

22     mentioned.  I don't remember the subpoena not

23     being mentioned.

24  Q.  When Mr. Wright and Ms. Lemanski came to your

40

file:///C|/Documents%20and%20Settings/Albert/My%20Documents/Visone/harris010506/Harris010506.txt

1    office in, like, September, October 2005, was

2    there ever any reference to the subpoena?

3  A.  I don't think at the time they came to our

4    office there was any express reference to the

5    subpoena made by them.  It's possible I may have

6    said something but I can't remember.

7  Q.  Turning your attention to the July 6, 2005,

8    letter, did Mr. Wright, when you spoke to him --

9    Mr. Wright called you at some point and said he

10    was going to cancel the meeting with you to come

11    see the records if you would send over certain

12    depositions and affidavits to him; is that

13    correct?

14  A.  I don't remember it being cancelled if -- I

15    don't remember being contingency type thing.

16        My recollection is that the meeting was

17    to be cancelled, I can't remember why it was,

18    the reason for that, and asking that I send

19    copies of the documents that I sent.

20  Q.  Did Mr. Wright explain to you why he wanted

21    those specific documents?

file:///C|/Documents%20and%20Settings/Albert/My%20Documents/Visone/harris010506/Harris010506.txt (49 of 61)1/17/2006 12:02:06 PM

22  A.  I don't know.  I don't recall if he did.  He may

23    have.  I can't remember.  He may have but I

24    can't remember.  I think he may have -- I can't

41

1    recall if it was him or some call at or about

2    that time that I got from Ms. Lemanski saying

3    that there was an interest in seeing those

4    documents for purposes of, I don't know if it

5    would have been Grand Jury or in anticipation of

6    the trial, but I guess some of these people were

7    going to be witnesses at the trial and there was

8    interest in having it for that purpose.  I

9    recall.

10        But I didn't inquire about these things,

11    about what the reasons for the request for

12    particular documents were.  And if somebody told

13    me, I didn't absorb it to the extent I can

14    really remember today.

15  Q.  Isn't it true that at that time, Mr. Wright told

16    you that Mr. Visone had been indicted and that

17    he was collecting this information for the

18    purposes of discovery for the upcoming trial?

19  A.  He may have at that point.  I can't remember.

20    But he may very well have.

21  Q.  Have you ever released someone from a subpoena?

22  A.  I have served subpoenas for keepers of records

23    and have on many occasions allowed people just

24    to send the records to me, so to the extent


42

1    that's a release of a subpoena.

2        And keeping in mind my work is all

3    civil, I don't do any criminal work at all, so

4    there have been occasions where I've subpoenaed

5    people for civil depositions and we've had to

6    reschedule or it turned out I probably didn't

7    need their testimony and cancelled the

8    deposition.

9        In my civil practice at least, it never

10    arises to any kind of formality as far as

11    releasing, any sort of formal release from a

12      subpoena.

13   Q.  So it's your understanding that a conversation

14       is an okay way to release someone from a

15       subpoena; there does not need to be a formal

16       release from the subpoena?

17   A.  In my civil practice, that's more or less the

18       custom and practice and in my experience in

19       civil cases and I'm referring really just to

20       pre-trial civil discovery subpoenas.

21   Q.  Do you know if there's some difference between

22       criminal and civil?

23   A.  Seemed like there was in law school.

24           I am just really -- I really have no


                        43

1    familiarity with criminal subpoena practice.

2    And in civil practice, I suppose if I studied

3    the notes to Rule 45, civil rules, there might

4    be some provision in there as far as formal

5    releases of subpoenas.  But the practice

6    generally tends to be informal, in practice.

7    Q.  During that informal practice, have you ever

8        told someone they wouldn't need to show up for a

9        deposition if, in return, they sent you

10       documents?

11   A.  Yes.  But with the understanding that they were

12       giving me the documents because they've been

13       subpoenaed.  So just to be clear on that.  Yes,

14       I have.

15   Q.  Is it your understanding that when you release

16       someone from a subpoena and tell them that they

17       do not need to appear, that you could no longer

18       hold them in contempt for not appearing?

19   A.  You know, I've never had to do that and -- let's

20       put it this way.  I guess it would be my

21       understanding if I executed some formal document

22       or went through some specific procedural course

23       that resulted in an effective voiding of the

24       subpoena or release of the subpoena, that I


                            44


1        suppose I would not be able to seek contempt

2     remedies if that was the case.

3          But in my civil practice, it's typically

4     the case that people get the records before the

5     subpoena date, or if it's after, if I have to

6     send another subpoena, I do it.

7          Really, I don't know how to answer the

8     question much more beyond that.

9   Q.  You said that you don't specifically recall

10    anyone ever mentioning the subpoena after I

11    guess it was the April 27, 2004, conversation

12    you had with Ms. Lemanski.

13         Do you, or I guess would you recall if

14    Ms. Lemanski or Mr. Wright or someone else from

15    the government had called you and said you must

16    comply with the subpoena, you know, do X

17    immediately or something to that effect?

18  A.  If that call had come, I -- well, speculation --

19    I probably would have remembered that, yes.  If

20    it had been that sort of an affirmative demand.

21  Q.  So you can rule out that it's unlikely that any

22    affirmative demand was made to you?

23  A.  Aside from the subpoena, there probably was not,

24    no.



45

1        MS. SACHSMAN:  We don't have anything

2    else at this time.

3        MR. CULLEN:  Let me just follow-up.

4            REDIRECT EXAMINATION

5    BY MR. CULLEN:

6    Q.  In your letter of June 8, 2005, and your letter

7      of July 6, 2005, in both letters you refer

8      you're producing the records in response to the

9      Grand Jury subpoena; is that correct?

10    A.  Yes.

11    Q.  Did the government or any person associated with

12      the government, Ms. Lemanski, Mr. Wright, any of

13      the other attorneys who may have been working on

14      this, call you up and say, wait, we released you

15      from this subpoena.  You're not producing these

16      pursuant to the subpoena?

17    A.  I don't recall that, no.

18    Q.  Now, in your civil practice, when you release

19    people from the subpoena, is it fair to say what

20    you're doing is releasing them from appearing

21    but they still have to produce the records

22    pursuant to that subpoena?

23  A.  Yes.

24  Q.  And isn't it your practice to say, after


46


1    reviewing the records, if I have any further

2    questions of you, I will contact you and we will

3    then have to schedule a date for a deposition?

4  A.  That happens on occasion, yes.

5        MR. CULLEN:  I have nothing further.

6    Let's discuss, I think you've agreed to produce

7    the FedEx receipts.

8        THE WITNESS:  If we have them, yes.

9        MR. CULLEN:  With respect to that, if

10    you have them.

11        I also would request copies of your

12    billing records only insofar as they show any

13    contact with Ms. Lemanski, Mr. Wright or any

14    other representative of the government in

15    relation to this subpoena.  If you have them.

16         You mentioned you had a diary, too.  The

17    same thing, white out pages of your diary.

18         THE WITNESS:  I looked at that before I

19    came here and all you're going to get is the two

20    dates in July and whenever it was, October, and

21    says Del Wright.  That's it.

22         MR. CULLEN:  That's fine.  If you could

23    send copies to me and Mr. Wright, I'd appreciate

24    it.  Okay?  That's it.


47

1         MS. SACHSMAN:  We just have one last

2    question.

3            RECROSS EXAMINATION

4    BY MS. SACHSMAN:

5  Q.  Is it fair to say that you were holding the

6    records for the government pursuant to the

7    subpoena?

8  A.  Holding on to them, yes.

9          MS. SACHSMAN:  That's it.

10          (10:07 a.m., proceedings adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24


                              48

1          CERTIFICATE OF COURT REPORTER

2          I, Kathleen L. Good, Certified Shorthand

3   Reporter and Registered Professional Reporter, do

4  certify that the deposition of GARRETT HARRIS, in

5  the matter of USA vs. Visone, on January 5, 2006,

6  was stenographically recorded by me; that the

7  witness provided satisfactory evidence of

8  identification, as prescribed by Executive Order 455

9  (03-13) issued by the Governor of the Commonwealth

10  of Massachusetts, before being sworn by me, a Notary

11  Public in and for the Commonwealth of Massachusetts;

12  that the transcript produced by me is a true and

13  accurate record of the proceedings to the best of my

14  ability; that I am neither counsel for, related to,

15  nor employed by any of the parties to the above

16  action; and further that I am not a relative or

17  employee of any attorney or counsel employed by the

18  parties thereto, nor financially or otherwise

19  interested in the outcome of the action.

20

21  _____

22  Kathleen L. Good, CSR, RPR

23

24

49

1                    INDEX

2  WITNESS:                    PAGE:

3   GARRETT HARRIS

4        BY MR. CULLEN              3

5        BY MS. SACHSMAN              38

6        BY MR. CULLEN              45

7        BY MS. SACHSMAN              47

8              *****

9  EXHIBITS:

10   No.  1, Subpoena              3

11   No. 2, Order              3

12   No. 3, Group of Documents              4

13   No. 3A, Subpoena              8

14   No. 3B, Letter, 4/26/04              16

15   No. 3C, Letter, 4/27/04              16

16   No. 3D, Fax, 6/8/05              22

17   No. 3E, Letter, 7/6/05              26

18              *****

19

20

21

22

23

24