# Internal Revenue Service
# Criminal Investigation Division

## Memorandum of Interview

---

| | | | |
|---|---|---|---|
| **In Re:** | Anthony Visone | **Location:** | 290 Pleasant Street |
| **Investigation #:** | 049930182 | | Marblehead, MA. 01945 |
| **Date:** | June 20, 2002 | | |
| **Time:** | 3:49-5:00 p.m. | | |
| **Participant(s):** | Daniel Wilensky, Witness | | |
| | Andy Shultz, Wilensky's Attorney | | |
| | Sandra Lemanski, Special Agent | | |
| | Richard Yee, Special Agent | | |

1. On June 20, 2002, Agents LEMANSKI and YEE went to 290 Pleasant Street in Marblehead, Massachusetts for the purpose of contacting DANIEL WILENSKY (hereafter WILENSKY). Upon arrival, we introduced ourselves to WILENSKY and presented our credentials for his inspection. WILENSKY invited us up to the back deck of his home and introduced us to his attorney ANDY SHULTZ (hereafter SHULTZ) who was already present at the location when we arrived. LEMANSKI explained to WILENSKY and SHULTZ that she was an investigation of ANTHONY VISONE (hereafter VISONE) and his related entities. LEMANSKI told BRIDGMAN that she wanted to ask him some questions relative to relationship with VISONE and his related entities. BRIDGMAN agreed to answer our questions in the presence of his attorney and responded as follows:

2. WILENSKY confirmed that his social security number was ███████1. WILENSKY was employed by VISONE'S company, FIRST CITY ACCEPTANCE from August 1989 until February 1997. WILENSKY met VISONE while purchasing a car from him. VISONE and WILENSKY started talking and VISONE offered him a job at FIRST CITY ACCEPTANCE. WILENSKY worked as a consultant from August 1989 until February 1990 when he became a salaried employee of FIRST CITY ACCEPTANCE.

3. Prior to accepting his position with FIRST CITY ACCEPTANCE, WILENSKY had been employed as a regional manager for a truck leasing company for three years. WILENSKY also held other jobs in the field of automobile and truck sales and leasing.

4. While employed at FIRST CITY ACCEPTANCE, WILENSKY always reported to VISONE and was responsible for overseeing the operations of the company. In the early 1990s when VISONE was expanding the company, WILENSKY also assisted VISONE with acquisitions of real estate and the opening of new corvette dealerships.

5. WILENSKY was not very involved in the day to day operations of the companies. WILENSKY did have check signing authority on some of the company's bank accounts, but he could not recall which ones.

6. VISONE'S aunt, MARY VISONE, prepared most of FIRST CITY ACCEPTANCE'S checks. Both WILENSKY and MARY VISONE had to receive authorization from VISONE before they could sign any checks and most of the accounts required a co-signer. WILENSKY stated that during his last two years at FIRST CITY ACCEPTANCE, VISONE was trying to squeeze him out of the business so he didn't sign many checks during those years.

7. WILENSKY had no involvement with the preparation of the corporation's audited financial statements or the corporate tax returns. It was VISONE and JOE GRAZIANO, the company's controller, who dealt with the accountants. Prior to GRAZIANO it was VISONE and JOHN CASEY.

8. In the late 1990's, WILENSKY was made the President of FIRST CITY ACCEPTANCE and VISONE'S holding company, FIRST CITY MANAGEMENT. Although WILENSKY was an officer of these corporations he had no ownership interests in either of these companies.

9. WILENSKY was a salaried employee of FIRST CITY ACCEPTANCE and also received commissions and some bonuses. It was VISONE who determined WILENSKY'S compensation, which was mainly salary in the last two years.

10. WILENSKY left FIRST CITY ACCEPTANCE in February 1997 after the deal with the Michigan Company owned by THOMAS LAPORTE (hereafter LAPORTE) had gone bad. WILENSKY left because he felt that VISONE had cheated him out compensation and opportunities relative to the deal with LAPORTE as well as the big securitization deal that took place in 1994.

11. In 1996 WILENSKY decided to start looking for new business opportunities because VISONE had been down sizing the business by closing down a lot of the dealerships. VISONE also started selling off the business's assets which were the lease and loan portfolios.

12. WILENSKY had developed a business plan and was shopping it around to several investors one of which was LAPORTE. The name of WILENSKY'S start up company was CARPOOL and his partners were FRANK PALESCHUCK and FAYZA IBRAHIM. Although LAPORTE expressed an interest in WILENSKY'S business at first LAPORTE got soft on the idea because it was a start up business. LAPORTE told WILENSKY that he was more interested in buying an existing business so WILENSKY told him that VISONE was in the process of selling off the assets of FIRST CITY ACCEPTANCE.

13. The original plan was that VISONE would sell the lease and loan portfolios to LAPORTE and LAPORTE would set up a company and hire WILENSKY, PALESCHUCK, and IBRAHIM. WILENSKY negotiated a deal between LAPORTE and VISONE where LAPORTE would pay VISONE two hundred thousand dollars up front and VISONE would take back notes totaling approximately two million dollars payable over the next two years. The deal went through and LAPORTE paid the initial two hundred thousand dollars. LAPORTE also paid the first installments due on the notes and sent WILENSKY and his partners a couple of paychecks. The payments than stopped coming and WILENSKY tried

    to contact LAPORTE but he wasn't returning his calls.

14. In February 1997 LAPORTE contacted WILENSKY and told him VISONE was a crook and cheated him out of a million dollars.  LAPORTE told WILENSKY that VISONE had gone behind WILENSKYS back and flown to Michigan with the intent to speed up the deal.  While in Michigan VISONE told LAPORTE that WILENSKY was crazy and wanted to cut him out of the deal.  LAPORTE told WILENSKY he had renegotiated with VISONE and had wired VISONE $750,000.

15. WILENSKY told LAPORTE he did not believe him because he had access to the bank records and the company received no such wire transfer.  LAPORTE told WILENSKY that the reason he didn't know about the wire transfer was because VISONE instructed LAPORTE to wire the money directly to BANK OF BOSTON where the funds were used to pay off the existing mortgage.

16. WILENSKY stated that after his conversation with LAPORTE he went to VISONE'S office and confronted VISONE with what LAPORTE had told him. WILENSKY stated that during this conversation VISONE got very angry with him, but did acknowledge that what LAPORTE had told him was true.  WILENSKY stated that VISONE also acknowledged that he had used this money to pay off the mortgage on the dealership property and told WILENSKY that it was his money and he would do what he pleased with it.

17. WILENSKY left the company shortly after this conversation with VISONE. By going behind his back and renegotiation the deal with LAPORTE, VISONE cheated WILENSKY out of the commission he was promised, which was to be a quarter of a point of the two million-dollar sales price.  WILENSKY also later sued LAPORTE for breech of contract.  This suite was just recently settled.

18. WILENSKY was asked if he had ever heard of SCOTTSDALE INVESTMENTS (hereafter SCOTTSDALE). WILENSKY doesn't know SCOTTSDALE or about a nine hundred thousand dollars loan given to SCOTTS DALE by FIRST CITY FINANCE in February 1996.

19. FIRST CITY ACCEPTANCE was VISONE'S leasing company and FIRST CITY FINANCE was VISONE'S financing company.  WILENSKY stated that this SCOTTSDALE loan could have something to do with TRANSAMERICA terminating FIRST CITY FINANCES twenty million-dollar line of credit because VISONE was moving money out of the company.  PAUL SANTACATARIN (ph) was the officer at TRANSAMERICA who told VISONE he was not allowed to move money out of his companies because this represented their collateral on the line of credit.

20. When the TRANSAMERICA loan was terminated VISONE replaced it with a line of credit from FINOVA.

21. WILENSKY was shown work paper number 2301.1 contained in O'CONNER & DREWS 1996 work paper file for FIRST CITY ACCEPTANCE titled loan receivable 1996.  WILENSKY was directed to deal number 000011 in the name of SCOTTSDALE INVESTMENTS.  WILENSKY stated that he didn't know about this loan but that JOE

GRAZIANO would have had to.

22. WILENSKY was asked if he had ever heard of SANDKEY INVESTMENTS (hereafter SANDKEY). WILENSKY had heard of SANDKEY and believes it had to do with VISONE'S purchase of several condominium units in the Foundry building in South Boston. WILENSKY did have some involvement in this property however not very much. WILENSKY did go and check out the property with VISONE and did have some involvement in the negotiations.

23. WILENSKY was told by VISONE that he was going to be given a piece of the ownership in these condominiums because VISONE owed him from other things such as the securitization deal. VISONE did show WILENSKY documents with his name on it, but didn't believe they were ever filed. WILENSKY stated that VISONE was famous for creating documents that were never executed.

24. WILENSKY stated that VISONE took money from FIRST CITY FINANCES' cash management account at FLEET bank to fund the purchase of these condominiums. CAESAR BALZOTTI, who was a roofer and a friend of VISONES, also had part of the ownership. MICHAEL BRIDGMAN managed these properties for VISONE.

25. WILENSKY was asked about TV REALTY TRUST. WILENSKY stated that VISONE had set up a bunch of trust to purchase real estate. WILENSKY was asked if he had received any checks from SANDKEY. WILENSKY stated that he did receive a couple of checks from VISONE out of the SANDKEY account, which he was told represented his share in the profits. WILENSKY said VISONE gave him these checks to placate him.

26. WILENSKY believes he was also listed as the trustee on a couple of real-estate trust created by VISONE to hold title to properties he purchased for the various dealerships such as the property in Indianapolis.

27. WILENSKY stated that in 1996 he wanted to keep growing the company but VISONE wanted to close six of the dealerships. In June and July of 1997, VISONE was in the process of taking down the company and was trying to obtain a new mortgage on the dealership property in Saugus. WILENSKY doesn't believe VISONE would have needed audited financial statements to obtain the new financing.

28. WILENSKY stated that VISONE changed after the securitization deal in 1994. VISONE walked away with six million dollars from that deal and instead of investing it back in the company he spent it. VISONE treated the company's money as his own. VISONE purchased two Ferrari and had the company pay all his and his parent's personal expenses such as his mother's credit card bills that averaged about $2,500 a month.

29. WILENSKY stated that the business was VISONE'S; he was the one hundred percent shareholder. The business was originally his parents but when VISONE took it over he had complete control and did not answer to anyone including his parents. VISONE was a micro manager and directed his aunt as to what bills were to be paid.

30. WILENSKY did receive loans from the company. WILENSKY acknowledged that in 1996

he received weekly checks in the amount of fifteen hundred dollars in addition to his salary. WILENSKY stated that VISONE authorized these payments and it was VISONE'S idea to issue them. VISONE told WILENSKY that he would classify these payments as loan and that at the end of the year he would issue him a bonus that would payback the loan and cover any taxes that he would owe. WILENSKY never received that bonus and it was his understanding the loan was left on the books. WILENSKY was never asked to pay back this loan and he never received a form 1099 for a forgiveness of debt.

31. WILENSKY did not know about VISONE'S paternity case until after he had already left the company. WILENSKY didn't know if VISONE reason for reducing both their wages had anything to do with the paternity case. VISONE told WILENSKY that it would save him on taxes.

32. WILENSKY stated that VISONE was big on trying to find ways to save on taxes and always claimed to know more about the tax code than his accountants. WILENSKY stated that one of the ways VISONE would try to save on the payment of taxes was that on a couple of weeks each year, instead of having the payroll company issue the payroll checks, VISONE would issue payroll checks out of the companies operating accounts. VISONE would issue the checks net of withholdings but would never pay over the taxes he withheld. WILENSKY stated that he new this because at the end of the year when the employees would receive their form W-2'S they would complain that the income and the withholdings figures were not correct.

33. WILENSKY stated that VISONE was a rich man who always cried poverty. WILENSKY stated that VISONE owned a lot of real-estate. WILENSKY suggested we contact OWEN GALLAGHER OF GALLAGHER AND GALLAGHER, because he was successful in obtaining a 1.2 million judgement against VISONE and has taken a lot of deposition of people in attempt to track down VISONE'S assets.

34. WILENSKY stated that VISONE obtained a degree from HARVARD UNIVERSITY where he majored in economics and obtained a minor in Spanish.

35. WILENSKY has not spoken to VISONE since he testified at the trial brought by OWEN GALLAGHER, which was approximately two years ago.

36. WILENSKY provided us with the following contact number, which is his cell phone number: 678-984-5774.

*Sandra Lemanski*
Sandra J. Lemanski
Special Agent

*Richard W. Yee*
Richard Yee
Special Agent