UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                                    )<br>)<br>ANTHONY VISONE,                        )<br>    Defendant                                  )<br>)<br>_____ ) | Criminal No. 04-10123 (DPW)<br>Judge Douglas P. Woodlock |

**Government's Proffer
of
Illegal Transfers and
Transfers to Defraud Third Parties**

**Introduction**

On May 8, 2006, the Court directed the Government to make a proffer of evidence of the Defendant's "unlawful diversions, such as embezzlement, theft, a violation of corporate law, or an attempt to defraud third party creditors." United Stated v. D'Agostino, 145 F.3d 69, 73 (2d Cir. 1998).  The information below highlights the evidence that the Government would be able to elicit at trial or in a pretrial hearing to demonstrate that the Defendant's transfers of assets in 1996 and 1997 (the "Prosecution Years") away from his businesses (collectively referred to as "FCM") are both illegal and attempts to defraud third party creditors.

In the indictment in this case (the "Indictment"), the Government alleged four specific items of unreported income in the Prosecution Years:

1. the $517,000 diversion out of FCM to fund the purchase of the Foundry property (the "Foundry") in 1996;

2. the regular weekly deposits of around $3,000 or $4,000 into the Defendant's checking account by FCM, totaling $148,000 in 1996 and $130,500 in 1997;

1698208.1

3.  the $743,000 diversion of a payment due to FCM which was used to extinguish a mortgage in another entity ("Broadway Realty Trust") controlled by the Defendant; and

4.  the payment of personal expenses on the Defendant's behalf in 1996.

Each of these items constituted an illegal attempt to defraud third party creditors.

**Background**

On January 6, 1995, a paternity action (the "Paternity Case") was brought against the Defendant in a Massachusetts probate court, and on January 17, 1995, that probate court set an initial support order. After that initial support order, the plaintiff in the Paternity Case began to seek to ascertain the Defendant's true financial condition. Based on the evidence, it appears that the plaintiff's actions caused the Defendant to enter into a series of fraudulent transactions to hide his income and assets. On December 15, 1998, based on the Defendant's affirmative steps to conceal his income and assets, the probate court placed the Defendant's business into receivership.

The Government also has evidence that the Defendant entered into an elaborate scheme to hide his assets in 1993, after his divorce from his first wife.[1] Because some of the transactions and nominee entities used in the Prosecution Years are the same nominee entities established to hide his assets in earlier years, and because all these items are relevant to the inquiry of the Defendant's basis, it may be necessary to discuss these items in our case-in-chief.

---

[1] The Defendant claimed a 1992 gross annual income of $18,500, and a net worth of negative $1.2 million. However, in the roughly two years that elapsed following his divorce, he acquired approximately $2.9 million in real estate through nominee entities.

In 1996, a case was brought against FCM and the Defendant personally by USF&G. On or about April 19, 1996, the court in that case enjoined the Defendant from any transfers out of the ordinary course of business. That injunction was in force through the Prosecution Years.[2]

**Fraudulent Transfers**

*1.     The $517,000 diversion to purchase the Foundry in 1996*

**Facts**

In early 1996, the Defendant decided to purchase the Foundry, a 26-unit condominium in South Boston. The property was in default to the FDIC, so the transaction was not simply a purchase and sale, but involved purchasing the mortgage on the property from the FDIC, and extinguishing the personal guarantees of the mortgagees.

In February 1996, the Defendant used his personal bank account to purchase a cashier's check for $517,000 to fund the purchase of the mortgages. However, he did not have enough cash in his bank account to cover the cashier's check, so he had FCM transfer $517,000 into his account to fund the cashier's check he gave to the FDIC. After the FDIC received the funds, the Defendant caused the mortgages to be conveyed to an entity called Scottsdale.

The Defendant and Caesar Balzotti ("Caesar") created Scottsdale to hold the mortgages and another entity called Sand Key to actually hold the property. The Defendant and Caesar were both 50% shareholders of Scottsdale and Sand Key. The Defendant was also the trustee of

---

[2]     The Government has been unable to procure the actual injunction in the court records. However, the Government has an Order of the Court which references the earlier injunction, and states that the earlier injunction is still in effect as of the date of the Order. The Order is dated well after the Prosecution Years.

a nominee trust which held a 59% interest in the actual Foundry condominiums.[3] Caesar held a 41% interest in the trust. Caesar's cousin Michael Balzotti ("Michael") was appointed as nominal president of both Scottsdale and Sand Key. Both Scottsdale and Sand Key were created specifically for the Foundry transaction –Scottsdale's sole asset was the mortgages and Sand Key's sole purpose was to serve as trustee of the trusts owning the Foundry. After the mortgages were conveyed to Scottsdale, the personal guarantees of the mortgagees were extinguished, and the Foundry was conveyed to Sand Key as trustee.

The Defendant ordered that the $517,000 used in the transaction be documented as a $900,000 loan to Scottsdale, and executed a $900,000 note (the "Scottsdale Note") to an FCM entity. The Scottsdale Note was "secured" by the mortgage, however, because there were no longer any personal guarantees standing behind the mortgage, the Defendant became both the *de facto* mortgagor and mortgagee of the Foundry.

In 1997, the Defendant ordered his accountants to write off the Scottsdale Note as uncollectible for the 1996 tax year, and they did so for both book and tax purposes. However, between 1998 and 2000, the Defendant secured over $2.1 million in loans using the Foundry as collateral. To obtain some of those loans, the Defendant nullified the assignment of the mortgages to FCM, which removed FCM's collateral for the Scottsdale Note.[4] The Defendant used the borrowed $2.1 million to pay personal expenses, and also used those funds to settle the Paternity Case and to pay the plaintiff's legal fees.

---

[3]    The 26 Foundry condominiums were held in 26 separate trusts, each with a name beginning with a different letter of the alphabet.

[4]    By keeping the mortgage on the property, the property appeared to be encumbered with a valid debt. However, the new lender did not want any pre-existing encumbrances on the property, and required that the Defendant extinguish the mortgage.

**Why it was Illegal**

The diversion of the $517,000 was a conscious attempt to defraud both the probate court and the plaintiff in the Paternity case. The Defendant concealed his ownership interest in the Foundry using the nominee entities, and then chose not to disclose the purchase in his financial statements to the probate court.

In the financial statements he filed with the probate court, the Defendant claimed only real estate assets in which he had negative or minimal equity. However, in financial statements he submitted to banks in order to get loans during the same period, he claimed real estate equity of over $3 million.

2.     *The weekly $3,000 or $4,000 deposits*[5]

**Facts**

Starting in 1996, the Defendant reduced his FCM salary from roughly $150,000 to roughly $20,000. At the same time, though, the Defendant arranged to have FCM issue him regular checks of $3,000-$4,000, which he arranged to have documented on FCM's books as "loans to shareholder". The total amount of these checks was $148,000 in 1996 and $130,500 in 1997.

The Defendant deposited these regular checks into his personal bank account, often at the same time as he deposited his FCM salary. While some of this money was spent on personal expenses, the majority of the money was used to purchase real estate in Texas.

---

[5]     The Government submits that because these $3,000-$4,000 payments should be considered compensation to the Defendant, these payments are not covered by the ruling in D'Agostino, which excludes salary and illicit bonuses. Therefore, the Defendant's tax returns would still be still false because they failed to report this additional salary.

In 1994, the Defendant entered into a deferred purchase agreement to acquire a property in Texas (the "Texas Property"). As part of the deal, the Defendant (both individually and as an officer of an FCM entity) entered into an escrow agreement which required him to make monthly $8,000 payments into an escrow account for five years, or until the seller passed away (each, a termination event). At the termination event, the Defendant had the right to purchase the property for $520,000.

In 1994 and 1995, the Defendant funded the escrow primarily from his FCM salary of roughly $150,000, i.e., he paid personal taxes on the money that he invested into the escrow account. In 1996 and 1997, the Defendant funded the escrow with the weekly $3,000-$4,000 checks that he characterized as "loans to shareholder". By characterizing this money as "loans," the Defendant sought to hide this additional income from the IRS and from the probate court. The Government submits that these payments were merely additional taxable salary to the Defendant.

When the seller passed away in 1997, the Defendant finalized the purchase of the Texas Property by depositing a number of $8,000 checks (over $100,000 of $8,000 checks) into the escrow account to fully fund it, then using the funds in the escrow account to purchase the Texas Property. At the closing of that transaction, the Defendant caused the Texas Property to be conveyed to a nominee trust called "Texas Properties No. 1 Trust". Thereafter, he executed a $520,000 note from Texas Properties No. 1 Trust to himself personally. When the trust made its first interest payment to the Defendant, he voided it and caused an entity supposedly controlled by his brother to become the beneficiary of the $520,000 note.

**Why it was Illegal**

As a threshold matter, the Defendant's act of reducing his salary by about $130,000, but not substantially reducing the amount of money he received from FCM, was an obvious attempt to defraud the probate court. The Defendant never actually reduced his salary, but merely disguised his salary as loans which he had no intention of repaying.

In addition, as was the case with the $517,000 diversion, the diversions of weekly checks constituted an illegal attempt to defraud both the probate court and the plaintiff in the Paternity case. In the case of the weekly checks, the funds were used to purchase real estate in which the Defendant concealed his ownership. The Defendant failed to include the Texas Property on his financial statements filed with the probate court, and after the trust acquired the property, he failed to disclose the $520,000 note as an asset.

3.  *The $743,000 diversion to pay Broadway Realty Trust mortgage*

**Facts**

In 1996, the Defendant structured the sale of a portfolio of FCM's lease assets. FCM was to receive a series of notes as consideration for the sale. Sometime in early 1997, the Defendant renegotiated the transaction, and as part of the renegotiated deal, the Defendant agreed to extinguish some of the notes in exchange for a payment of roughly $743,000. However, instead of having the $743,000 payment go to FCM, the Defendant instructed the purchaser to issue a $743,000 check payable to the Bank of Boston. In February 1997, the purchaser sent the $743,000 check to the Defendant, who used the funds to extinguish a mortgage held by Broadway Realty Trust, which the Defendant had personally guaranteed.

During the Prosecution Years, the Defendant reported on his tax returns that he was a 75% beneficial owner of Broadway Realty Trust. In other documents, however, he claimed to be the 100% beneficial owner of Broadway Realty Trust.

The Defendant never informed the FCM accountants of either the renegotiated deal or the $743,000 payment. Instead, the Defendant told FCM's accountants that the FCM receivable (related to the notes FCM received as consideration) was uncollectible, and should be written off. At the time of the write off, as recorded in FCM's financial statements and accounting records, Broadway Realty Trust owed money to FCM, so the $743,000 could not be deemed a repayment of a debt owed to Broadway Realty Trust by FCM.

**Why it was Illegal**

The diversion of the $743,000 constitutes a violation of the injunction. In directing the $743,000 to extinguish an indirectly personal obligation of the Defendant over any potential creditors of FCM, the Defendant is transferring assets out of the ordinary course of FCM's business. In addition, by seeking to have the accountants write off the receivable, the Defendant is attempting to conceal his violation and obstruct justice.

In addition, though more attenuated, the diversion and its aftermath demonstrate an attempt to defraud the probate court. When the Broadway Realty Trust mortgage was extinguished in 1997, the Defendant did not record the debt as being extinguished. In November 1998, a hearing was held in the probate court in which an expert reported to the court that the Defendant had a substantial amount of equity in some Broadway Realty Trust assets. Immediately after that hearing, on November 23, 1998, the Defendant, as trustee of Broadway Realty Trust, executed a $1.1 million mortgage in favor of his parents. Three weeks later, on

December 13, 1998, the Defendant caused the $1.1 million mortgage to his parents to be extinguished.  The next day, on December 14, 1998, the Defendant, as trustee of Broadway Realty Trust, borrowed $600,000, secured by the Broadway Realty Trust's assets.

The Defendant never disclosed any Broadway Realty Trust assets to the probate court during the Prosecution Years.  In 1995, however, he did disclose one piece of property held in Broadway Realty Trust's name (despite there being at least three additional properties held in Broadway Realty Trust's name).  In that 1995 filing, he showed that the one Broadway Realty Trust property he was willing to disclose had negative equity, i.e., the property's debts exceeded its value.

4.     *The personal expenses paid by FCM*

**Facts**

The Defendant used FCM and Broadway Realty Trust to pay numerous personal expenses. The Defendant admitted to an IRS Agent that he was aware of his obligation to report the value of those expenses, but failed to do so.  The expenses included payments for his housekeeper, alimony payments, babysitter payments and lease payments for his three Ferraris.  The expenses also included substantial FCM monies advanced to Broadway Realty Trust that the Defendant and his parents used to fund their lifestyles.

**Why it was Illegal**

Coupled with the reduced salary and the regular checks of $3,000-$4,000, the Defendant orchestrated a scheme to underreport his income and assets to the probate court.  In order to maintain his and his family's lifestyle, he needed FCM to pay his expenses and fund his investments, but do so in a way that allowed him to conceal those payments to potential

creditors. By filing financial statements and tax returns with the probate court that failed to include all the funds available to him, he materially misrepresented his financial situation and perpetrated a fraud on the probate court.

**Conclusion**

  For the foregoing reasons, the Government submits that it can demonstrate that the Defendant's actions in transferring assets out of FCM were illegal attempts to defraud third party creditors.

                Respectfully submitted,

                DANA BOENTE
                Deputy Assistant Attorney General

                /s/ <u>Del Wright, Jr.</u>
                /s/ <u>Susanne Sachsman</u>
                Trial Attorneys
                U.S. Department of Justice

CERTIFICATE OF SERVICE

A copy of the foregoing document will be transmitted to all parties once filed.

                                                          /s/   Del Wright Jr.
                                                              Trial Attorney
                                                               U.S. Department of Justice